# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Hyland, 2012 IL App (1st) 110966**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KRAIG HYLAND, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-0966 |
| Filed<br>Rehearing denied | November 21, 2012<br>December 20, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for unlawful use of a weapon by a felon and unlawful possession of a firearm by a street gang member were reversed outright on the ground that the State failed to show the arresting officers had probable cause to justify defendant's warrantless arrest, regardless of the fact that defendant ran from the police. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-2232(01); the Hon. Evelyn B. Clay, Judge, presiding. |
| Judgment | Reversed; sentences vacated. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Gilbert C. Lenz, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and Jon Walters, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE STERBA delivered the judgment of the court, with opinion.

Presiding Justice Salone specially concurred, with opinion, joined by Justice Neville.

**OPINION**

¶ 1    Following a jury trial, defendant Kraig Hyland was convicted of one count of unlawful use of a weapon by a felon and one count of unlawful possession of a firearm by a street gang member. He was sentenced to concurrent prison terms of three years on each count. Defendant raises multiple issues on appeal. First, defendant contends that the trial court erred in denying his motion to quash his arrest and suppress evidence where the State failed to show that the arresting officers possessed knowledge of facts supporting probable cause to justify an arrest without a warrant. Defendant further contends that his convictions must be vacated because the statutes creating the offenses at issue violate the constitutional right to bear arms. Alternatively, where both of his convictions arose from the same physical act, defendant contends that his conviction for the less serious offense must be vacated under the one-act, one-crime doctrine. Finally, defendant contends that trial counsel was ineffective for: (1) failing to file a motion to sever the two counts, which allowed the jury to be inundated with unfairly prejudicial gang evidence that was only relevant to one of the counts; (2) failing to move for a mistrial or object to testimony that allowed the jury to infer that he had committed a previously uncharged murder; and (3) failing to object to the State's improper bolstering of a witness's credibility during closing rebuttal. Defendant also asks this court to amend the mittimus to properly reflect credit against his sentence for time served. For the reasons that follow, we reverse.

¶ 2                              BACKGROUND

¶ 3    On January 13, 2010, defendant was arrested and charged with one count of unlawful use of a weapon by a felon and one count of unlawful possession of a firearm by a street gang member. At the hearing on defendant's motion to quash his arrest and suppress evidence, defendant testified that he worked as a barber at a shop located at 217 East 71st Street in Chicago. On the morning of January 13, defendant testified that he was in the barbershop with two other barbers and three clients. Two detectives knocked on the door of the

barbershop. The door to the shop was kept locked and people had to either be "buzzed" in electronically or the door had to be opened manually. Defendant testified that one of the clients was smoking marijuana so they had to spray the shop down first before they opened the door for the detectives. Defendant stated that they thought the detectives were there to investigate a robbery that had occurred at the barbershop on December 30. Instead, one of the detectives pointed at him and said that he had violated an order of protection. The detective told him that they would have to take him in and he could discuss the matter with a judge the following day. Defendant put his hands behind his back and the detective placed handcuffs on him. His codefendant objected and the detectives stated that they were going to take the codefendant into custody for aiding and abetting. The detectives called for a transport car and, when it arrived, placed both men in the backseat of the vehicle to be transported to the police station. As the vehicle pulled away, defendant saw the detectives return to the barbershop. Defendant stated that after he had been at the police station for 45 minutes, the detectives came in with two guns and said, "Look what we got here, that's why y'all didn't let us in the shop."

¶ 4        On cross-examination, defendant stated that he had left the shop at 9 a.m. to walk to the corner store, but that was the only time he was outside the shop that morning. Defendant further testified that when the detectives brought the guns to the police station, he told them they were lying and one of the detectives told him it was defendant's word against the detective's word. Defendant stated that he did not have a gun in his possession and was not aware of any guns in the barbershop.

¶ 5        Officer Sledge testified that he was with his partner, Officer Boyd, in an unmarked squad car on January 13. Two other officers were in another unmarked car and were communicating with them via radio. Officer Sledge stated they saw defendant and codefendant standing on the sidewalk outside the barbershop. There was a dumpster at the curb in front of the building. Officer Sledge and his partner exited their vehicle and approached the men, because they knew there was an investigative alert for defendant on a violation of an order of protection. The other two officers were also on the scene and exited their vehicle. As the officers approached, the two men looked in their direction and ran toward the barbershop, pushed the door open, and went inside. Officer Sledge followed them into the shop, cornered the codefendant in the back of the shop, and performed a protective search. The other officers attended to defendant. Officer Sledge testified that, prior to performing the protective search, he had not observed any weapon on the codefendant. Officer Sledge also testified that the shop was closed and under foreclosure at the time of the incident.

¶ 6        Officer Sena testified that he was working with his partner, Officer Lara, on January 13. Along with Officers Sledge and Boyd, Officer Sena saw defendant and codefendant standing in front of the building at 217 East 71st Street. Officer Sena testified that there was no dumpster in front of the building. When they saw the officers, the two men ran into the building and Officer Sena ran after them. He detained defendant in the rear of the shop. Officer Sena testified that the officers were doing a follow-up investigation of defendant because he had an investigative alert for a violation of an order of protection. Officer Sena placed defendant in custody, performed a custodial search, and retrieved a semiautomatic

pistol from defendant's front waistband. Officer Sena stated that he placed defendant in custody because there was probable cause to arrest him for the investigative alert. Officer Sena further testified that there were other investigative alerts that day, but he had only printed out the alert for defendant. He stated that defendant's alert caught his attention because he had had prior "run-ins" with defendant and knew that the barbershop was one of his "hangout spots." Officer Sena also stated that the barbershop was not a legal place of business because it did not have a permit.

¶ 7 The trial court found that the officers were credible and that the only instance of contradiction, regarding whether or not there was a dumpster outside the shop, was not germane to the issue of whether a lawful arrest occurred. The trial court found that both defendants were lawfully arrested given the totality of the circumstances. Therefore, the motion to quash the arrest and suppress evidence was denied. Counsel for defendant subsequently learned that the codefendant filed a motion to reconsider and the trial court reversed its earlier ruling with respect to the codefendant and granted the motion to quash his arrest and suppress evidence. However, the trial court explained that counsel for defendant had not timely filed a motion to reconsider and the case against defendant proceeded to trial.

¶ 8 At trial, Officer Sena testified that on January 13, he was working as a tactical officer. He went to the district office to check for investigative warrants and alerts for the district. He obtained an investigative alert for defendant and printed out a photograph. He then notified his partner and two other officers and the four officers proceeded to 217 East 71st Street in two separate vehicles. They arrived at the location shortly before noon. Officer Sena observed defendant standing in front of the location with another individual. Defendant was dressed in a T-shirt and was not wearing a coat. When Officer Sena stopped his vehicle in front of the location, the two men ran into the building. Officer Sena and the other officers ran into the building in pursuit of defendant through the unlocked door. Officer Sena caught up with defendant just past the first room in the building, placed him in custody because of the investigative alert, and performed a custodial search. A 9-millimeter weapon was recovered from defendant's front waistband. The officers then called for a transport vehicle and defendant was taken to the police station. Officer Sena testified that there was a back door to the building, but that neither of the men attempted to get out the back door. On cross-examination, Officer Sena testified that when he first saw defendant outside the barbershop, he had a view of defendant from the front and did not see a gun in his waistband.

¶ 9 Officer Lara testified that he was working with Officer Sena on January 13. They went to 217 East 71st Street to look for defendant. When they arrived at that location, they saw defendant and codefendant outside on the sidewalk. Officer Lara testified that it was cold that day and that defendant was wearing some type of coat or outer garment. When the officers approached, the two men ran inside the building. The officers followed them into the building and Officer Lara and his partner placed defendant in custody and performed a custodial search, during which Officer Sena recovered a 9-millimeter handgun from defendant's front waistband. Defendant was transported to the police station and Officers Lara and Sena questioned him there after reading him his *Miranda* rights. Defendant indicated that he understood his rights and that he wished to speak with the officers. Officer

Lara asked defendant why he had a gun and defendant replied that he had it for protection because they had been robbed two weeks earlier. Officer Lara then asked defendant if he was a member of a gang and defendant said he was a "70s Babies GD." Officer Lara understood that to mean that defendant was from a section of the Gangster Disciples street gang comprised of members who were born in the 1970s. Officer Lara asked defendant what he did for the gang and defendant replied that he was a foot soldier. Officer Lara explained that a foot soldier is a lower ranking gang member who sells narcotics.

¶ 10    After being asked whether he had any gang tattoos, defendant showed the officers two tattoos on his stomach and left forearm. Officer Lara was also shown a photo of defendant in which he identified two teardrop tattoos below defendant's right eye. He explained that, in his experience, teardrops under the eye indicate that a member of the gang has been killed. If the teardrop is filled in, it indicates that the gang has retaliated against whoever killed their fellow gang member. If the teardrop is open, it indicates that there has been no retaliation for the killing.

¶ 11    Officer Sledge was accepted as an expert witness in the area of street gang activities on the basis of his training in that area and his experience related to his assigned duties as an officer. Officer Sledge stated that there was no process for getting out of a gang and explained that a gang member simply might not be active. Officer Sledge testified that when a gang member has a teardrop tattoo, it means that one of his fellow gang members got hurt, shot or killed. If the teardrop is colored in, it means the person with the tattoo is the one "who did retribution for a slain gang member." At the end of his testimony, defense counsel asked Officer Sledge to verify that the fact that a person has tattoos does not mean that person is a gang member and Officer Sledge agreed. Defense counsel then asked, "A person could have absolved himself from a gang at any time, is that correct?" Officer Sledge answered, "That's correct." Officer Sledge was asked on redirect how easy it was to get out of a gang and he stated that it was not easy, especially if the person lives in the same area and associates with the same people, but that a person could actually remove himself from the gang if he wanted to.

¶ 12    The parties stipulated that defendant had a prior felony conviction. Defendant then called his former codefendant, Ricky Montgomery. Montgomery testified that on the date in question, he was at the barbershop located at 217 East 71st Street with defendant. Some men came to the door and he realized they were police officers when he saw their badges. Montgomery testified that the officers knocked on the door, because the door was kept locked. When they realized the men were police officers, Montgomery stated, they opened the back door and sprayed something to mask odors because they had been smoking marijuana in the shop. Then one of the other barbers opened the door for the police. Montgomery asked the officers if they were there to investigate the robbery that had occurred at the shop and the officers said no, they had an investigative alert for defendant. The officers then proceeded to pat defendant down. Montgomery testified that the officers did not recover a gun from defendant. One of the officers started looking around the shop and Montgomery told him that if he had a warrant for defendant but not for the shop, he could not search the shop. The officer told Montgomery he was a "smart ass" and after a verbal exchange, the officer handcuffed Montgomery and said he was taking Montgomery to jail for aiding and

abetting. Montgomery and defendant were placed in a transport vehicle and taken to the police station by different officers. The original two officers were joined by some other officers and they all went back into the shop. The arresting officers arrived at the police station about 45 minutes later. One of the officers came into the interview room with two guns and said, "Look what we found. This is what took y'all so long to open the door." Montgomery told the officers he had never seen the guns before.

¶ 13    Defendant testified that he was released from the penitentiary in 2002 and that, prior to his release, he attended a class because he wanted to stop drinking and doing drugs and he wanted to renounce his gang membership. Defendant testified that on January 13, 2010, he was in the barbershop. Apart from a trip to the store in the morning, defendant did not go outside the shop that day. He testified that it was cold and blowing and there was an icy rain. Around noon, two men came to the door of the shop and knocked. He thought they looked like police officers because one of the men was Caucasian and it was unusual to see a white person walking around in that neighborhood. The other barbers had been smoking marijuana, so he told them to spray the shop down and open the back door to let some air pass through the shop. The front door was locked, so someone had to go to the door and open it to let the officers in.

¶ 14    When the officers entered the shop, the occupants asked them if they had heard anything about a robbery that had occurred at the shop earlier. The officers said no, but asked which person was named Hyland. Defendant stated that he was Hyland and one of the officers told him that he had "an invest alert." The officer explained that the alert was for a violation of an order of protection and defendant asked how he had violated the order. The officer said defendant had called someone who had an order of protection against him for a domestic dispute. The officers told defendant they would have to take him to the police station. Defendant told the other barbers not to worry about him and asked them to call his mother and tell her that the police were taking him to the station, that he did not know what he had done, and that he had not called anyone in violation of the order. The officers placed him in handcuffs and started looking through the drawers of his booth, and then walked over to the other booths in the shop and continued to search. Montgomery told the officers they could not search the shop, and one of the officers said, "We got a little smart ass right here." Montgomery again told them they could not search the shop, and the officer asked Montgomery why he was interfering in their investigation. Montgomery told them they did not have a search warrant and they could not search the shop. The officer then grabbed Montgomery and handcuffed him. Officer Sena asked them what took them so long to open the door. Defendant acknowledged that they got sarcastic with the officers because they already knew they were going to jail anyway, so they told the officers that they could not search the shop no matter what the occupants had been doing before they opened the door. The officers then called for a transport vehicle, placed defendant and Montgomery inside, and they were transported to the police station.

¶ 15    Approximately 45 minutes later, Officers Sena and Lara arrived at the police station. One of the officers had two guns in his hands and told defendant one of the guns was his. The officers asked defendant if he was a member of a gang and defendant told them that he was when he was younger but he was no longer affiliated with a gang. Defendant further testified

that there was a dumpster in front of the shop and he did not see the officers pull up outside the shop. Defendant testified that he was previously a member of the Gangster Disciples, but that he did not know what "70s babies" were. He explained that the tattoos on his face represented his father and his grandfather, who had both been killed. He further explained that the tears were red for blood, that he lost his blood, and that his father and grandfather were the only people he had in his life.

¶ 16 During closing arguments, the State highlighted the testimony of Officer Sledge and stated that the jury heard about the tattoos defendant had and what those tattoos meant. On rebuttal, the State told the jury that Officer Sena was the only officer who knew the defendant and there was no way he could have gotten the other officers to go along with a frame up because "[n]o Chicago police officer is going to risk his career and frame this guy." The jury found defendant guilty of unlawful use of a weapon by a felon and possession of a firearm by a street gang member.

¶ 17 Defendant filed a motion for a new trial, arguing, *inter alia*, that the motion to quash his arrest and suppress evidence should have been granted. The trial court denied the motion. At the sentencing hearing, defendant addressed the court and explained that he had dropped all gang involvement after his imprisonment for residential burglary 10 years earlier and had been working since then as a barber to provide for his children. He again stated that the police had fabricated the charges against him and asked for the court's understanding. The trial court stated that it was impressed by defendant's remarks and believed he was sincere and was well on the road to rehabilitation. The trial court further stated that after defendant paid his debt to society and returned to his work as a barber, he needed to make sure nobody in the barbershop was smoking marijuana or doing anything illegal in his presence, and that he could never be around firearms again. The trial court said that it was impressed with defendant's determination to leave the gang life behind him and was going to "cut [him] some slack" on the sentence. The trial court stated that because it believed every word defendant had said, it would give him the lowest possible sentence of three years. Defendant timely filed this appeal.

¶ 18 ANALYSIS

¶ 19 Defendant first contends that the trial court erred in denying his motion to quash his arrest and suppress evidence where the State failed to show that the arresting officers possessed knowledge of facts supporting probable cause to arrest. Defendant argues that the State failed to meet its burden at the suppression hearing where none of the arresting officers had personal knowledge of the facts supporting probable cause and the State did not call an officer who did.

¶ 20 A motion to suppress involves mixed questions of law and fact. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). Because the trial court is in a superior position to determine the credibility of witnesses, findings of historical fact will be upheld on review unless they are against the manifest weight of the evidence. *Id*. However, a reviewing court is also free to undertake an independent assessment of the facts in relation to the issues presented. *Id.* The ultimate question of whether the evidence should be suppressed is reviewed *de novo*. *Id.*; see

also *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006).

¶ 21    In the case *sub judice*, defendant has not challenged the trial court's findings of fact at the hearing on the motion to suppress. Instead, defendant argues that once he challenged the warrantless arrest, because the arresting officers did not have personal knowledge of the facts supporting probable cause, it was the State's burden to produce evidence at the suppression hearing from someone who possessed such knowledge. We agree.

¶ 22    On a motion to suppress evidence, the defendant generally bears the burden of showing that the search and seizure were unlawful. See, *e.g.*, *People v. Janis*, 139 Ill. 2d 300, 308 (1990); *People v. Neal*, 109 Ill. 2d 216, 218 (1985); *People v. Hoskins*, 101 Ill. 2d 209, 212 (1984). However, because warrantless searches are *per se* unreasonable, if the defendant challenges the warrantless search and demonstrates that he was doing nothing unusual at the time of the search, the State has the burden to demonstrate that the search was legally justified. *People v. Lawson*, 298 Ill. App. 3d 997, 1001 (1998). Moreover, while an arrest may be based on information of which the arresting officer does not have personal knowledge, when the State attempts to justify a warrantless arrest on that basis, it must establish that the information relied on was based upon facts sufficient to establish probable cause to make an arrest. *Id.* at 1001-02 (and cases cited therein).

¶ 23    Testimony from both officers who testified at the hearing on the motion to suppress established that the officers approached defendant on the basis of an investigative alert that indicated that there was probable cause for his arrest. Officer Sena testified that he took defendant into custody based on an investigative alert for a violation of an order of protection, performed a custodial search, and found the weapon. Neither officer testified to any personal knowledge of the facts underlying the issuance of the investigative alert.

¶ 24    The *Lawson* court cites to numerous cases in which this court and our supreme court have held that while tips, radio bulletins, or official police communications may be relied upon by arresting officers, the State must demonstrate that the information relied upon was sufficient to establish probable cause to arrest the defendant. *Id.* (citing *People v. Tisler*, 103 Ill. 2d 226, 237 (1984), *People v. Bascom*, 286 Ill. App. 3d 124, 127-28 (1997), *People v. Aguilar*, 286 Ill. App. 3d 493, 496 (1997), *People v. Crane*, 244 Ill. App. 3d 721, 724-25 (1993), *People v. Rimmer*, 132 Ill. App. 3d 107, 113 (1985), and *People v. Crowell*, 94 Ill. App. 3d 48, 50 (1981)). These cases rely on *Whiteley v. Warden*, 401 U.S. 560 (1971), where the arresting officer relied on a radio bulletin advising officers that a warrant had been issued for the defendant's arrest. The Supreme Court stated:

"Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest." *Id.* at 568.

In a subsequent case, the Supreme Court clarified that "*Whiteley* supports the proposition that, when evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who *issued* the flyer

possessed probable cause to make the arrest." (Emphasis in original.) *United States v. Hensley*, 469 U.S. 221, 231 (1985).

¶ 25     At the hearing on the motion to suppress, the State only presented evidence that the arresting officers relied on the investigative alert as the basis for taking defendant into custody and performing a custodial search. The State presented no evidence that the underlying facts of the investigative alert established probable cause to arrest defendant, either from the officer who issued the investigative alert or from the individual who obtained the protective order that defendant allegedly violated. Thus, the trial court erred in denying defendant's motion to quash arrest and suppress evidence.

¶ 26     The State contends that defendant forfeited this issue because he did not raise this specific argument in the proceedings below, and also because defendant acknowledged that the police informed him that they had an investigative alert for his violation of an order of protection. These arguments are without merit. First, defendant's testimony that the police officers informed him that he was being arrested for a violation of a protective order is not evidence that the underlying facts of the investigative alert were sufficient to support probable cause for his arrest. Moreover, defendant's actual testimony was that the detectives told him he violated the order by calling someone, and he told the other people in the shop that he did not know what he had done and that he had not called anyone in violation of the order. Thus, far from verifying that the facts underlying the investigative alert were sufficient to support probable cause, defendant's testimony highlights the very reason why it was so critical for the State to independently establish that those facts were indeed sufficient.

¶ 27     In order to preserve an issue for appellate review, a defendant must object at trial and raise the issue in a posttrial motion. *People v. Ward*, 154 Ill. 2d 272, 293 (1992); *People v. Coleman*, 227 Ill. 2d 426, 433 (2008). It is not necessary for the defendant's objection to state identical grounds for contesting the issue. See *People v. Mohr*, 228 Ill. 2d 53, 65 (2008) (noting that the defendant is not required to object to a jury instruction on identical grounds but is only required to object before and after trial to preserve the issue for review); *Coleman*, 227 Ill. 2d at 433 (reviewing suppression of evidence issue where defendant argued the same issue under a different theory before the trial court and also raised it in a posttrial motion).

¶ 28     Defendant filed a motion to quash arrest and suppress evidence, arguing that the officers did not have probable cause to arrest him. In his posttrial motion, defendant argued that the trial court erred in denying his motion to suppress. Therefore, this issue has been sufficiently preserved for review. Moreover, as previously discussed, when a defendant challenges a warrantless arrest, the burden shifts to the State to establish that the underlying facts were sufficient to establish probable cause for arrest. We have found no authority for the State's contention that the burden only shifts if the defendant specifically challenges the facts underlying the police communication relied upon by the arresting officers.

¶ 29     The State devotes the bulk of its argument to explaining that the police officers did not conduct a custodial search of defendant but rather conducted a proper "Terry stop and frisk." See *Terry v. Ohio*, 392 U.S. 1, 22 (1968). We reject this argument on multiple grounds. First, defendant correctly notes that, by failing to argue the theory of a *Terry* stop at trial, the State has forfeited this argument on review. See *People v. Adams*, 131 Ill. 2d 387, 396 (1989). At

the hearing on the motion to suppress and at trial, the State argued that the officers had probable cause to arrest defendant on the basis of the investigative alert and that the weapon was recovered during a custodial search. At no point during the trial did the State argue that this was a *Terry* stop and frisk. Thus, the State has forfeited this argument on review.

¶ 30    Even if the State had not forfeited this argument, we are not persuaded that the search of defendant was justified under *Terry*, or even that the officers' interaction with defendant constituted a valid *Terry* encounter. First, the State has not established that the police officers conducted a valid *Terry* stop. Under appropriate circumstances, a police officer is entitled to briefly detain a person for questioning without probable cause if the officer reasonably believes that the person has committed, or is about to commit, a crime. *Terry*, 392 U.S. at 22. Such limited investigatory detentions are permissible only upon a reasonable suspicion based upon specific and articulable facts that the person has committed, or is about to commit, a crime. *Id.* at 21-22.

¶ 31    The only evidence of a reasonable belief by the officers that defendant committed a crime was the investigative alert for the violation of the order of protection. However, this merely established that other officers might possess facts sufficient to support probable cause to actually arrest defendant; there was no evidence presented that established a basis for an investigative detention. Officer Sena testified that he knew defendant and had printed his photo. He went to the barbershop because he knew there was a strong possibility that he would find defendant there and could arrest him. Officer Sledge corroborated this testimony, stating that the officers went to the barbershop looking for defendant on the basis of a violation of an order of protection. There was no evidence presented at trial that the officers' initial encounter with defendant was merely for investigative purposes. Moreover, in relying on the investigative alert as the basis for the *Terry* stop, the State faces the same problem it faced in relying on the alert to establish probable cause. As this court noted in *Lawson*, even for a *Terry* stop, the State must establish "enough indicia of reliability [of information on which an arresting officer relies] to justify the officer's forcible stop." (Internal quotation marks omitted.) *Lawson*, 298 Ill. App. 3d at 1004. The State, however, did not present any evidence from which it might be inferred that the officer who issued the investigative alert possessed facts which would have justified the stop. See *id.*

¶ 32    The State further suggests that the fact that defendant ran as soon as he saw the officers was sufficient to justify a *Terry* stop. It is well settled that flight alone is not sufficient to establish reasonable suspicion that a person has committed, or is about to commit, a crime. *People v. Harris*, 2011 IL App (1st) 103382, ¶ 12 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000)). However, unprovoked flight together with an individual's presence in an area of expected criminal activity could potentially be sufficient. *Id.* The State's attempt to argue that the second factor was met here is not supported by the evidence. While crimes certainly were committed in the area of the barbershop, as evidenced by testimony that there had been a robbery at the shop a few weeks earlier, the police officers arrived at the shop in the middle of the day, not in response to reports of any suspected criminal activity or any suspicious behavior on the part of defendant, but specifically looking for defendant. This is not sufficient to justify a *Terry* stop on the basis of defendant's flight in a "high crime area." Thus, the State has not established that the situation involving defendant was a valid *Terry*

-10-

encounter.

¶ 33 Moreover, even if the State had shown that the officers conducted a valid *Terry* stop, it has not shown any justification for a *Terry* frisk. When an officer conducting a *Terry* stop reasonably believes that the individual he is investigating is armed and dangerous, the officer may conduct a pat-down search to determine whether the individual is carrying a weapon. *People v. Sorenson*, 196 Ill. 2d 425, 432 (2001). However, this search, commonly referred to as a "frisk," is only valid where the officer conducting the frisk can point to specific, articulable facts which, when taken together with natural inferences, would cause a reasonably prudent person to believe that his safety or that of others was in danger. *People v. Flowers*, 179 Ill. 2d 257, 264 (1997).

¶ 34 There is no evidence in the record that the officer conducting the frisk ever pointed to specific, articulable facts that would cause him to think defendant was armed and dangerous. Indeed, Officer Sena testified at trial that he had a clear view of the front of defendant outside the barbershop, that defendant was dressed in a T-shirt and was not wearing a coat, and that he did not see a weapon in defendant's waistband. On appeal, the State argues that a reasonably prudent officer would have believed defendant was armed and dangerous because he immediately fled with his codefendant upon seeing the officers, and because the investigative alert was based on a violation of an order of protection in a domestic dispute. Apart from the fact that the officer who conducted the frisk never articulated such a belief, the State's arguments have no merit. Flight is certainly not an indication that a person is armed and dangerous, whether that flight is by one person alone or two together. Testimony established that the officers did not see weapons on either defendant or codefendant before they were searched. Moreover, the only evidence at trial related to details of the violation of the protective order was provided by defendant himself, who testified that the officers told him that he had violated the protective order by calling someone he was not supposed to call. Such information would hardly suggest that defendant could be a potential danger to the officers. Therefore, even if the State had not waived this argument, there is no evidence that the police officers conducted a valid *Terry* stop or frisk.

¶ 35 Finally, the State argues in the alternative that the police officers had probable cause to arrest defendant for obstruction of justice because they had an investigative alert for his arrest and he initially fled from them. This argument is circular and fails for the same reason we have already concluded that the trial court erred in denying the motion to suppress. In order to establish that the arrest was legally justifiable, the State had to provide evidence that the facts underlying the investigative alert were sufficient to support probable cause for an arrest. In the absence of such evidence to support probable cause on the basis of the investigative alert, the fact that the defendant fled from the police does not provide probable cause for an arrest on obstruction of justice grounds.

¶ 36 For the foregoing reasons, we reverse defendant's convictions on the grounds that the trial court erred in denying defendant's motion to quash his arrest and suppress evidence. Moreover, because neither conviction can stand in the absence of any weapon, this cause will not be remanded. See *People v. Surles*, 2011 IL App (1st) 100068, ¶ 42 (and cases cited therein). Because we are reversing defendant's convictions outright, we need not reach the remaining issues on appeal.

-11-

¶ 37    Reversed; sentences vacated.

¶ 38    PRESIDING JUSTICE SALONE, specially concurring.

¶ 39    I agree with the majority's finding of no probable cause in this case, which originated in Chicago, and question the legality of the Chicago police department's (CPD) policy of issuing investigative alerts under any circumstances. In doing so, I acknowledge this issue has yet to be addressed in any detail.

¶ 40    Our research has failed to find a constitutional or statutory provision that authorizes the creation or issuance of an investigative alert. During oral argument, the State confirmed our research. Although proponents of the investigative alert practice argue it is acceptable to detain persons of interest, I find the practice to be an impermissible warrantless arrest of a suspect.

¶ 41    Arrest pursuant to warrant is the preferred constitutional (U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6) and statutory (725 ILCS 5/107-2(c) (West 2010)) method of taking an individual into custody, with certain exceptions. See *Wong Sun v. United States*, 371 U.S. 471, 481-82 (1963) ("The arrest warrant procedure serves to insure that the deliberate, impartial judgment of a judicial officer will be interposed between the citizen and the police, to assess the weight and credibility of the information which the complaining officer adduces as probable cause."); see also *Beck v. Ohio*, 379 U.S. 89, 96 (1964) ("An arrest without a warrant bypasses the safeguards provided by an objective predetermination of probable cause, and substitutes instead the far less reliable procedure on an after-the-event justification for the arrest or search, too likely to be subtly influenced by the familiar shortcomings of hindsight judgment."); see also *United States v. Leon*, 468 U.S. 897, 913-14 (1984) ("Because a search warrant 'provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer "engaged in the often competitive enterprise of ferreting out crime," ' *United States v. Chadwick*, 433 U.S. 1, 9 (1977) (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)), we have expressed a strong preference for warrants and declared that 'in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall.' *United States v. Ventresca*, 380 U.S. 102, 106 (1965).").

¶ 42    Supporters of investigative alerts as a practice argue that individuals who raise questions surrounding their use can file the appropriate pleadings to make their concerns known to the court. This position assumes the practice is constitutionally and statutorily permissible and invites litigation that can be substantially reduced if, instead, the prevailing practice is that an investigating officer seek an arrest warrant from a neutral member of the judiciary. Supporters further contend that investigative alerts save valuable police resources and lead to more efficient investigations and, therefore, the practice is an acceptable exception to the preferred method of arrest by warrant. I am not persuaded this justifies the practice.

¶ 43    The detention of an individual because of an investigative alert is generally triggered by police contact in an unrelated matter, *i.e.*, a traffic stop or field interview. The law allows a police officer to question an individual concerning a specific police matter. However, the law

-12-

is clear that questioning is limited to a "reasonable period of time" and that the detention is to occur at the scene of the stop. Under section 107-14 of the Code of Criminal Procedure of 1963, "[a] peace officer, after having identified himself as a peace officer, may stop any person in a public place for a *reasonable period of time* when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense as defined in Section 102-15 of this Code, and may demand the name and address of the person and an explanation of his actions. Such detention and temporary *questioning will be conducted in the vicinity of where the person was stopped*." (Emphases added.) 725 ILCS 5/107-14 (West 2010). I find the reasonable suspicion that justified the stop of the individual on a matter unrelated to the underlying investigative alert is not enough to support detention of that individual for as long as the alert anticipates, which includes being transported to the police department and being held there for questioning, where there are other legal alternatives, *i.e.* seeking an arrest warrant, available to achieve the same result.

¶ 44    I take judicial notice of the CPD's special orders. Ill. R. Evid. 201(c) (eff. Jan. 1, 2011). The CPD has dedicated training materials and formalized procedures to instruct officers on the practice of investigative alerts. The extensive resources the CPD has expended to outline how an investigative alert must be processed and implemented, specifically its requirement that a supervisor review and approve each alert, shows the subjective nature of such an undertaking and the CPD's recognition that it is granting its officers a substantial power. The goal of an investigative alert, detaining an individual for questioning, is essentially the same as that of an arrest warrant, without the constitutional safeguards. Departure from constitutional safeguards to investigate a crime was not warranted in this case, nor is it in any case.

¶ 45    Under CPD Special Order S04-16, investigative alerts fall into two categories, "Investigative alert/Probable Cause to Arrest" and "Investigative alert/No Probable Cause to Arrest." Despite the terminology being used, practically speaking, an investigative alert has been elevated to the status of an arrest warrant, without the safeguards provided by a judicial determination of probable cause. Just as the term "*Terry* stop" is now known as a "field interview" and use of the word "suspect" has been replaced by "a person of interest," the term "investigative alert" (note, "investigative alert" was proceeded by the term "stop order"), is the successful re-characterization of "arrest warrant." With an investigative alert, the CPD has institutionalized an end run around the warrant requirement in the Constitution by (1) permitting a police officer, instead of a judge, to find probable cause and (2) commanding:

"Officers who run name checks on individuals who have an Investigative alert/Probable Cause to Arrest on file will:

a. take the *subject into custody* if not already in custody

b. *process the arrestee* in accordance with the procedures outlined in the General Order entitled 'Processing Persons Under Department Control.' Indicate on the *Arrest Report* (CPD-11.420) that the *arrestee* is the subject of an Investigative alert/Probable Cause to Arrest." (Emphases added.) Chicago Police Department Special Order S04-16 (eff. Mar. 6, 2001).

There is no mention of the constitutional rights of the arrestee in custody based on an executed investigative alert. There is no reference to the need for judicial review of the officer's finding of probable cause in CPD's directives. In its glossary[1], CPD states:

> "[An] Investigative alert/Probable Cause to Arrest, identifies an individual that is wanted by the Bureau of Investigative Services (BIS) investigative personnel concerning a specific crime, and *while an arrest warrant has not been issued, there is probable cause for an arrest*." (Emphasis added.)

Special Order S04-16 also provides, "Supervisors will approve or reject investigative alert requests in CHRIS [Criminal History Records Information System]." Chicago Police Department Special Order S04-16 (eff. Mar. 6, 2001). The unit investigative alert file is audited each police period (28 days) to ensure investigative alert requests on file are canceled when the subject of the alert has been apprehended or the investigative alert is no longer needed.

¶ 46    Noticeably absent from these provisions is any reference to judicial review. The thought that any summons to take a subject into custody is merely reviewed every police period, without any mention of judicial intervention, cannot stand. Police officers cannot grant themselves unbridled power to take into custody persons without the benefit of an arrest warrant, save the exceptional circumstances already present in case law. However, that is exactly what the investigative alert process does.

¶ 47    A finding of probable cause is within the sole authority of a neutral and detached judge after review of an affidavit or hearing. There is no guarantee of such a finding. Judges do not always agree on probable cause. "Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination." *Leon*, 468 U.S. at 914 (citing *Spinelli v. United States*, 393 U.S. 410, 419 (1969), *overruled on other grounds by Illinois v. Gates*, 462 U.S. 213 (1983)). The issuing officer of an investigative alert is not neutral and detached, nor a member of the judiciary. Moreover, any information the issuing officer had is imputed to his supervisor, meaning the supervisor is also not neutral nor detached.

¶ 48    In the present case, the supervisor approved the investigative alert issued for defendant and, thus, presumably found probable cause. The trial court agreed. This panel unanimously held no probable cause for arrest was present. It is not a given that the facts and circumstances will warrant a finding of probable cause. See *People v. Geier*, 407 Ill. App. 3d 553 (2011) (this court reversed the trial court's order quashing the defendant's arrest for driving under the influence and suppressing the evidence from the traffic stop, holding the police officer who observed the defendant's vehicle cross the fog line had probable cause to stop the defendant's vehicle). For this reason, I find the practice of investigative alerts particularly troubling. An individual picked up on an investigative alert is likely not to understand the legal difference between such a detention and one effectuated from an arrest warrant. If the individual does not challenge the detention, and all the evidence gathered from

___

[1]See http://directives.chicagopolice.org/directives (last visited Nov. 8, 2012).

that point on, on probable cause grounds, we are allowing a practice with no legal basis to become quasi-law merely because it is common practice.

¶ 49    Because there will undoubtably be cases in which a subsequent finding of probable cause by a neutral judge justifies the arrest effectuated under an investigative alert, proponents argue the issue of probable cause should be fleshed out in court during litigation. However, this is a classic example of the end justifying the means. Instead, I want to promote better law enforcement by encouraging the police to seek an arrest warrant or proceeding under the current exceptions to the warrant requirement. By shortchanging an individual's constitutional protections to get a potential suspect to the police station for questioning, we are not looking at the big picture; vital evidence may be suppressed. See *People v. Garcia*, 94 Ill. App. 3d 940 (1981) (in reversing defendant's conviction for aggravated kidnaping and murder, this court held the record failed to support the existence of probable cause to arrest defendant and, therefore, his arrest should have been quashed, and all evidence including statements and the *corpus delicti* which were fruit thereof should have been suppressed).

¶ 50    Under the current policy, if a police officer finds an individual with an outstanding investigative alert, the individual is taken into custody, which often means handcuffed, and brought in for questioning. When an individual is detained through an investigative alert, that individual is essentially under arrest for fourth amendment purposes. Evidence gathered or learned as a result of a warrantless arrest is often successfully contested in court on fourth amendment grounds. Requiring that officer to instead present evidence to a neutral member of the judiciary to be sure there is sufficient probable cause, rather than proceed under an investigative alert, would allow the police, where probable cause is lacking, the opportunity to gather more evidence rather than make an illegal arrest that would result in suppression of any evidence seized.

¶ 51    Allowing the practice of investigative alerts to continue to side-step judicial review gives arrest warrant power to the police, and constitutes an impermissible violation of the suspect's constitutional rights. Here, as in the majority of the cases, the information underlying the investigative alert did not occur contemporaneously with the questioning and detention of the suspect and, therefore, the officers had time to comply with the law. Although the law permits warrantless arrests based on the officer having a reasonable belief the individual is committing or has committed an offense, the preferred method is through an arrest warrant. A neutral judge or magistrate must issue a felony arrest warrant. If there is time to get a supervisor's approval for the investigative alert, as the special order requires, there is time to seek an arrest warrant from a member of the judiciary. For these reasons, the practice of circumventing the warrant requirement in the Constitution by issuing investigative alerts as a means of taking a potential suspect in to custody must cease.


¶ 52    JUSTICE NEVILLE joins in this special concurrence.