2021 IL App (1st) 182611-U

No. 1-18-2611

Order filed August 19, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 7098 |
| | ) | |
| DANIEL BROWN, | ) | Honorable |
| | ) | Maura Slattery Boyle, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The summary dismissal of defendant's *pro se* postconviction petition is affirmed when it failed to present an arguable claim of ineffective assistance of appellate counsel.

¶ 2    Defendant Daniel Brown appeals from the circuit court's summary dismissal of his *pro se* petition for relief filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2018)). On appeal, defendant contends that the court erroneously dismissed the petition because it stated an arguable claim that he was denied the effective assistance of appellate

counsel for failure to challenge trial counsel's deficient performance in preparing a motion to quash arrest and suppress evidence, and to argue the trial court's violation of Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) constituted plain error where the evidence was closely balanced. We affirm.[1]

¶ 3     Following a jury trial, defendant was found guilty of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) and sentenced to 90 years in prison. The facts were detailed in our order on direct appeal. See *People v. Brown*, 2017 IL App (1st) 142197. We therefore relate only the facts relevant to the instant appeal.

¶ 4     Defendant's arrest arose from the fatal shooting of Eddie Coleman on the evening of March 6, 2012. Defendant then filed a motion to quash arrest and suppress evidence alleging that he was arrested without a warrant and probable cause.

¶ 5     At the hearing on the motion, Chicago police detective Donald Hill testified that defendant was arrested without a warrant on March 21, 2012. Afterwards, he was shown in lineups, and Hill knew that the State planned to use the results at trial.

¶ 6     During cross-examination, Hill testified that when he arrived at the scene of the shooting on March 6, 2012, he learned that Natasha Coleman and Kathleen Coleman witnessed the shooting and stated that "Nu-Nu" was the shooter.[2] Dominique Coleman, who did not witness the shooting, also knew Nu-Nu. Officers Medina and DeJesus, who were at the crime scene, searched for Nu-Nu in a police department database and generated a photograph which was shown to

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] For clarity, we will refer to the victim and his family members by their first names. Additionally, although defendant's nickname appears as "Nunu" and "Nu-Nu" in the record, we will use "Nu-Nu" in accordance with our order on direct appeal.

Dominique.[3] She identified the photograph of Nu-Nu as defendant. Hill and other officers then created a photographic array containing defendant's photograph. Approximately three hours after the shooting, Natasha, and Kathleen each identified defendant in photographic arrays. Hill later relocated to a liquor store a block from the shooting and obtained a surveillance video that showed defendant and Eddie conversing. After learning that Eddie died, Hill's partner issued an investigative alert for defendant. Defendant was arrested, placed in lineups, and identified by Natasha, Kathleen and Mablelene Coleman.

¶ 7     During redirect, Hill acknowledged that Natasha and Kathleen identified the shooter as Nu-Nu and that Dominique did not witness the shooting. He did not know if the database contained more than one individual named Nu-Nu. Prior to defendant's arrest, Hill could not connect physical evidence from the crime scene to defendant. Nothing prevented Hill from attempting to obtain an arrest warrant for defendant. During recross, Hill testified that before going to a hospital with Eddie, Mablelene told Dominique that Nu-Nu was the shooter.

¶ 8     Trial counsel argued there was no probable cause to arrest defendant based upon two "very shaky" identifications and no physical evidence. The State replied that Kathleen's and Natasha's identification of defendant as the shooter in separate photographic arrays supported the investigative alert that led to defendant's arrest. The trial court denied the motion.

¶ 9     During jury selection, when the trial court asked the venire if anyone did not understand and accept that the presumption of innocence was not overcome unless the State proved the defendant's guilt beyond a reasonable doubt, juror L.L. stated, "I don't understand." The trial court replied, "I'll get to that in a second. Other than Ms. [L.L.], is there anyone that does not understand

---

[3] The transcript does not include these officers' first names.

and accept that principle? Please raise your hand at this time *** no one has raised their hand." The court continued to question the venire pursuant to Supreme Court Rule 431(b).

¶ 10    During individual questioning, the trial court asked L.L. about her age, employment, education, residence, marital status, and whether she, a family member, or close friend had been a victim of a crime, involved in a criminal case, or a party to a lawsuit. The court asked if she knew lawyers, judges, or police officers, whether she ever visited anyone detained or incarcerated, and how she received the news. L.L. responded in English, generally providing one-word answers. She responded affirmatively when the judge asked whether she would weigh the credibility of witnesses without regard to their occupations and would listen to all the evidence and apply the law as instructed in a fair and impartial manner.

¶ 11    Later, in chambers, the trial court stated:

> "One preliminary matter. Ms. [L.L.]. While beginning questioning she raised her hand indicating—she stated that she had trouble understanding English. The Court placed the same questions to her as every other juror, she answered appropriately. She did not indicate at any time struggling with anything, so the Court will not strike her for cause."

¶ 12    Trial counsel did not ask the court to further question L.L. or to excuse her for cause. Thereafter, a jury was selected.

¶ 13    At trial, Taheerah Abdullah, Eddie's girlfriend, testified that she and Eddie walked from the home of Eddie's Aunt Mablelene to a store where Eddie spoke with men from the neighborhood, including Nu-Nu. Abdullah identified defendant in court as Nu-Nu. Eddie and defendant spoke in the parking lot and were "kind of hostile." After a woman who was with defendant spat on her, Abdullah returned to Mablelene's house. Later, while on the porch, she

heard a gunshot and saw Nu-Nu, whose arm was extended, chasing Eddie. There was another gunshot and Eddie yelled, "ouch." Abdullah ran inside because she thought Nu-Nu was "coming after" her. She later identified defendant in a lineup.

¶ 14    Kathleen, Eddie's aunt, testified that as she exited her parked vehicle, she saw Nu-Nu chasing Eddie. At trial, Kathleen identified defendant, whom she knew from the neighborhood, as Nu-Nu. Defendant, wearing a purple hoody, shot Eddie in the back. Eddie fell to the ground, defendant jumped over him, turned, and shot him again. Kathleen yelled, and defendant looked toward her. Defendant then shot at a light pole and left. When police officers arrived, she told them that Nu-Nu shot Eddie. Kathleen later identified Nu-Nu in a photographic array. At trial, she testified that defendant was the subject of that photo. On March 21, 2012, she identified defendant in a lineup.

¶ 15    Natasha, Eddie's cousin, testified that she saw Eddie being chased by defendant, who held a firearm. She identified defendant, whom she knew from school, in court. Natasha heard a gunshot and saw Eddie fall. Defendant then jumped over Eddie, turned, and shot him again. She heard Kathleen's voice and saw defendant fire at a light pole as he ran away. Natasha told police that Nu-Nu shot Eddie, and subsequently identified Nu-Nu in a photographic array. She later identified defendant in a lineup.

¶ 16    Mablelene, defendant's aunt, testified that after hearing gunshots, she went to the front door where her daughter Natasha was standing. There, she saw Nu-Nu, whom she identified in court as defendant, running with a firearm in his hand, so she called 911. When Dominique arrived, Mablelene told her that Nu-Nu shot Eddie. Dominique then spoke to police officers. During cross-examination, Mablelene acknowledged that she did not see defendant shoot Eddie.

¶ 17    Dominique testified that after receiving a call that Eddie had been shot, she went to her aunt Mablelene's home. There, Mablelene told her Nu-Nu shot Eddie. Dominique identified defendant in court as Nu-Nu. She told officers at the scene that she was told Nu-Nu was the shooter and could identify him and showed them his photo on Facebook.

¶ 18    Chicago police officer Kevin Fry testified that Dominique stated that Mablelene identified the shooter as Nu-Nu and showed him a photograph of Nu-Nu. Dominique was taken to a squad car where other officers ran a search and retrieved a photo of Nu-Nu.  Dominique confirmed that this was the person she was told was the shooter. Fry relayed defendant's name to a detective and identified defendant in court as the person in the photograph.

¶ 19    Chicago police detective William Meister testified that he and his partner interviewed Kathleen and Natasha at a police station the night of the shooting. Natasha and Kathleen identified the shooter as Nu-Nu, and Natasha gave a physical description. After officers at the crime scene indicated that defendant had been identified as Nu-Nu, Meister created a photo array that included a photo of defendant. Natasha and Kathleen separately viewed the array and identified the photo of defendant as Nu-Nu.

¶ 20    Hill testified consistently with his testimony at the hearing on the motion to suppress, including that he obtained a store surveillance video. That video showed defendant wearing a black jacket over a purple hoody and conversing with Eddie. This footage was admitted into evidence and published without objection.

¶ 21    The State presented additional evidence, through the testimony of Chicago police officers and a forensic DNA expert, that defendant was arrested pursuant to an investigative alert and could

not be excluded as contributing to DNA recovered from items at the crime scene. The jury found defendant guilty of first-degree murder.

¶ 22    Defendant filed a motion for a new trial alleging, in pertinent part, that the trial court erred when it denied the motion to quash arrest and suppress evidence because the police lacked probable cause to arrest him. The court denied the motion, and following a hearing, sentenced defendant to 90 years in prison.

¶ 23    On direct appeal, defendant contended, in relevant part, that the trial court failed to conduct an adequate *voir dire* of venire member L.L., who indicated she did not understand a fundamental principle of the right to a fair trial before an impartial jury. Defendant admitted forfeiting this issue but requested plain error review because it affected the fairness of his trial and challenged the integrity of the judicial process. In the alternative, defendant contended he was denied effective assistance by trial counsel's failure to preserve this issue for appeal.

¶ 24    We determined that the trial court failed to comply with Supreme Court Rule 431(b) and *People v. Zehr*, 103 Ill. 2d 472 (1984), when it did not ascertain whether L.L. understood and agreed with the second *Zehr* principle and possibly the third and fourth *Zehr* principles, but found no abuse of discretion in the trial court's conclusion that the *voir dire* of L.L. demonstrated she did not struggle to understand English and was competent to serve as a juror. *Brown*, 2017 IL App (1st) 142197, ¶¶ 39-41. Moreover, defendant failed to meet his burden under the second prong of plain error review when he cited no authority establishing that L.L.'s statement during *voir dire* admitted a " 'lack of understanding of one of the essential qualifications of a juror,' " and defendant presented no evidence of L.L.'s bias. *Id.* ¶ 41.

¶ 25 We also determined that defendant was not denied effective assistance when trial counsel failed to preserve this error for review, as defendant did not establish that counsel's decision to accept L.L. as a juror was not a matter of trial strategy. *Id.* ¶¶ 45-48. Further, "the evidence was more than sufficient to prove defendant guilty beyond a reasonable doubt, and there was no evidence that L.L. rejected the principle that the State does not overcome defendant's presumption of innocence unless the State proves his guilt beyond a reasonable doubt." ¶ 48. Ultimately, we corrected the mittimus while affirming the circuit court in all other aspects. *Id.* ¶¶ 85-87.

¶ 26 On August 27, 2018, defendant filed a *pro se* postconviction petition alleging, in relevant part, ineffective assistance for trial counsel's failure to challenge defendant's arrest based upon an investigate alert or object to a juror who did not understand "the 2nd *Zehr* principle." Defendant asserted that had trial counsel challenged defendant's arrest pursuant to an investigative alert, the motion to quash arrest and suppress evidence would have been granted. Defendant further alleged ineffective assistance of appellate counsel for not raising this issue on direct appeal or arguing "first prong" plain error for the jury selection claim. On October 18, 2018, the circuit court denied defendant postconviction relief.

¶ 27 On appeal, defendant contends that the circuit court erred because the petition made an arguable claim that he was denied effective assistance when appellate counsel failed to argue that trial counsel was ineffective for not challenging defendant's arrest on the basis of an investigative alert or the jury selection claim under the closely-balanced prong of the plain error rule.

¶ 28 The Act provides a procedural mechanism through which a defendant may assert a substantial denial of his constitutional rights in the proceedings which resulted in his conviction. 725 ILCS 5/122-1 *et seq.* (West 2018). At the first stage of proceedings under the Act,

the defendant files a petition, which the circuit court independently reviews and, taking the allegations as true, determines whether it is frivolous or is patently without merit. *People v. Tate*, 2012 IL 112214, ¶ 9. A petition should be summarily dismissed as frivolous or patently without merit only when it has no arguable basis in either fact or law. *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009). A petition lacks an arguable basis in fact or law when it "is based on an indisputably meritless legal theory or a fanciful factual allegation." *Id.* at 16. Fanciful factual allegations are those which are "fantastic or delusional," and an indisputably meritless legal theory is one that is "completely contradicted by the record." *Id.* at 16-17. We review the summary dismissal of a postconviction petition *de novo*. *Id.* at 9.

¶ 29    When considering a claim of ineffective assistance of counsel at the first stage of postconviction proceedings, the defendant must show both that counsel's performance was arguably deficient, and that he was arguably prejudiced by counsel's deficient performance. *Id.* at 17 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)).

¶ 30    Defendant first contends that he was denied effective assistance on direct appeal when counsel did not raise trial counsel's failure to challenge defendant's arrest based upon an investigative alert specifically under the Illinois Constitution.

¶ 31    Claims of ineffective assistance of appellate counsel are judged against the same two-pronged *Strickland* standard. *People v. Simmons*, 2020 IL App (1st) 170650, ¶ 48. To succeed, a defendant must show counsel's failure to raise an issue on direct appeal was objectively unreasonable, and that he was prejudiced by this decision. *People v. Harris*, 206 Ill. 2d 293, 326 (2002). In other words, defendant must establish that but for counsel's error, there is a reasonable probability that his appeal would have been successful. *People v. English*, 2013 IL 112890, ¶ 33.

¶ 32    Generally, counsel's decision not to raise an issue on appeal receives substantial deference. *Harris*, 206 Ill. 2d at 326. It is not incompetence to refrain from raising issues which, in counsel's judgment, are without merit, unless counsel's appraisal is patently wrong. *People v. Simms*, 192 Ill. 2d 348, 362 (2000); see also *People v. Williams*, 209 Ill. 2d 227, 243 (2004) (rather than raise "every conceivable issue on appeal," appellate counsel "exercise[s] professional judgment to select from the many potential claims of error that might be asserted"). Absent a showing that the underlying issue is meritorious, a defendant is not prejudiced by appellate counsel's failure to raise it on appeal. *People v. Barrow*, 195 Ill. 2d 506, 523 (2001).

¶ 33    Here, defendant argues that trial counsel's failure to rely on *People v. Hyland*, 2012 IL App (1st) 110966, to argue that his arrest pursuant to an investigative alert was unconstitutional constituted deficient performance. Therefore, defendant concludes he was denied effective assistance on direct appeal when counsel failed to raise this meritorious issue.

¶ 34    "Probable cause for an arrest exists when the totality of the facts and circumstances known to the officer is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime." (Internal quotation marks omitted.) *People v. Braswell*, 2019 IL App (1st) 172810, ¶ 27. "An arrest without probable cause or a warrant based thereon violates" both the United States and Illinois constitutions. *People v. Lee*, 214 Ill. 2d 476, 484 (2005). A defendant bears the initial burden of proof, and once he shows a *prima facie* case of an unconstitutional arrest, the burden shifts to the State to show his warrantless arrest was based on probable cause. *Simmons*, 2020 IL App (1st) 170650, ¶ 49. However, the ultimate burden of proof remains with the defendant. *Id.*

¶ 35   The parties do not dispute that defendant's arrest was warrantless. Therefore, the State was required to demonstrate that the arrest was based on probable cause, and therefore legally justified.

¶ 36   An arrest without a warrant is valid only when supported by probable cause. *People v. Grant*, 2013 IL 112734, ¶ 11. Police have probable cause to arrest an individual when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the individual committed a crime. *Id.* Whether probable cause exists depends on the totality of the circumstances at the time of the arrest. *Id.* An officer's factual knowledge, based on his or her police experience, is relevant to determining probable cause. *Id.* Probable cause is governed by commonsense considerations, and the calculation concerns the probability of criminal activity rather than proof beyond a reasonable doubt. *Id.*

¶ 37   While an arrest may be based on information beyond the arresting officer's personal knowledge, the State must show that the information reflected facts sufficient to show probable cause. See *Hyland*, 2012 IL App (1st) 110966 ¶ 22. "An arresting officer may rely on information received in an official police communication, provided that the officer who issued the communication had probable cause to arrest." *Simmons*, 2020 IL App (1st) 170650, ¶ 56.

¶ 38   After reviewing the record, we conclude that the State presented sufficient evidence to establish that the police had probable cause to arrest defendant for shooting Eddie. At the hearing on the motion to quash arrest and suppress evidence, Hill testified that when he arrived at the crime scene, he learned that Natasha and Kathleen witnessed the shooting and identified the shooter as Nu-Nu. Additionally, although Dominique did not witness the shooting, she was told by Mablelene that Nu-Nu was the shooter, knew Nu-Nu, and provided officers with a photograph of Nu-Nu. Hill further testified that fellow officers generated a photograph which was shown to Dominique, and

she identified the subject as Nu-Nu. Several hours later, Natasha and Kathleen identified defendant in separate photographic arrays as the shooter. After learning of Eddie's death, Hill's partner issued an investigative alert for defendant.

¶ 39 Thus, at the time of defendant's arrest, he had been identified in photographic arrays as the shooter by two eyewitnesses to the shooting. Although Hill did not obtain an arrest warrant, the facts known to him when the investigative alert was issued were sufficient to establish probable cause to arrest defendant. *Grant*, 2013 IL 112734, ¶ 11.

¶ 40 Defendant, however, relies on *Hyland* to support his argument that appellate counsel should have challenged trial counsel's failure to attack defendant's arrest on the basis of an investigative alert in the motion to quash arrest and suppress evidence.

¶ 41 In that case, the defendant was approached by two officers based on an investigative alert stating that he violated an order of protection. *Hyland*, 2012 IL App (1st) 110966, ¶ 6. The officers performed a custodial search that recovered a firearm. *Id.* The defendant was arrested and charged with unlawful use of a weapon by a felon and unlawful possession of a firearm by a street gang member. *Id.* ¶ 3.

¶ 42 At the hearing on the defendant's motion to quash to arrest and suppress evidence, the State presented the testimony of the arresting officers, who approached the defendant based on the investigative alert, but lacked personal knowledge of the facts underlying its issuance. *Id.* ¶¶ 5-6. We reversed the trial court's denial of the motion, finding that the State "presented no evidence that the underlying facts of the investigative alert established probable cause to arrest defendant, either from the officer who issued the investigative alert or from the individual who obtained the protective order that defendant allegedly violated." *Id.* ¶ 25.

¶ 43    In the case at bar, unlike *Hyland*, the State presented the testimony of Hill, the detective assigned to investigate the shooting, who described the steps that he, his partner, and other officers took in order to identify defendant as the shooter. Hill's testimony regarding what officers knew prior to the issuance of the investigative alert is much more detailed than the testimony presented in *Hyland* and reflected Hill's personal knowledge of the case.

¶ 44    Defendant also relies on *People v. Bass*, 2019 IL App (1st) 160640, ¶ 43, for the proposition that an arrest based solely on an investigative alert is unlawful under the Illinois Constitution even where the investigative alert is supported by probable cause. In *People v. Bass*, 2021 IL 125434, ¶ 26, however, our supreme court recently found that the traffic stop that led to the discovery of the investigative alert issued for the defendant was unreasonably extended and the motion to suppress should therefore have been granted. Having affirmed this court's decision to reverse the defendant's conviction and remand for a new trial, the supreme court declined to "express any opinion on limited lockstep analysis, its application to warrants or investigatory alerts, or the constitutionality of investigative alerts," and vacated the "portions of the appellate [court] opinion dealing with these issues" *Id.*    ¶¶ 27, 29-31.

¶ 45    Here, defendant's arrest was supported by probable cause in that two witnesses identified him as the shooter by nickname and in photographic arrays. Thus, defendant's warrantless arrest did not violate the Illinois Constitution on that basis. Accordingly, defendant cannot show he was prejudiced by trial counsel's failure to challenge defendant's arrest pursuant to an investigative alert. As the issue was not meritorious, defendant cannot establish that he was arguably prejudiced by appellate counsel's failure to raise it on direct appeal.

¶ 46    Defendant next contends that he was denied effective assistance on direct appeal when appellate counsel did not challenge the trial court's failure to comply with Supreme Court Rule 431(b) under the first prong of the plain error rule. He concludes that he was prejudiced because the evidence at trial was "not overwhelming," and such an argument would have been successful.

¶ 47    The plain error doctrine permits this court to consider an unpreserved error when (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). The first step in plain error review is to determine whether an error occurred. See *People v. Hood*, 2016 IL 118581, ¶ 18 (without error, there can be no plain error).

¶ 48    On direct appeal, as discussed, we determined the trial court failed to comply with Supreme Court Rule 431(b) when it did not ascertain whether L.L. understood and agreed with the second *Zehr* principle and possibly the third and fourth *Zehr* principles but found no abuse of discretion in the trial court's conclusion that its *voir dire* of L.L. demonstrated she did not struggle to understand English and thus was competent to serve as a juror. *Brown*, 2017 IL App (1st) 142197, ¶¶ 39-41. Contrary to defendant's position on appeal, however, the result of his direct appeal would not have been different had appellate counsel argued that the evidence was closely balanced.

¶ 49    To determine whether the evidence was closely balanced, we "must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. This requires "an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses'

credibility." *Id.* Our supreme court has held evidence is close when a factfinder is left to resolve a credibility contest, which occurs when both the State and defense present credible versions of events and neither version is corroborated or contradicted by extrinsic evidence. *Id.* ¶ 63; see also *People v. Naylor*, 229 Ill. 2d 584, 607 (2008) ("Given these opposing versions of events, and the fact that no extrinsic evidence was presented to corroborate or contradict either version, the trial court's finding of guilty necessarily involved the court's assessment of the credibility of the two officers against that of defendant.").

¶ 50    In the case at bar, the evidence was not closely balanced when Kathleen and Natasha testified that defendant shot Eddie and Mablelene placed defendant at the scene of the shooting holding a firearm. Additionally, Abdullah testified that defendant and Eddie engaged in a "hostile" discussion at a store prior to the shooting, and that she saw defendant chasing Eddie with an extended arm and heard gunshots and Eddie yell "ouch." Moreover, a surveillance video showed defendant and Eddie conversing that night, and defendant contributed to DNA recovered from the crime scene. The trier of fact was not required to resolve a contest of credibility when the State presented a credible version of events which was corroborated by a surveillance video and physical evidence. *Sebby*, 2017 IL 119445, ¶ 63. As the evidence was not closely balanced, defendant cannot establish that he was prejudiced by appellate counsel's decision not to raise this issue on direct appeal. See *Barrow*, 195 Ill. 2d at 523.

¶ 51    As defendant has failed to establish that he was arguably denied the effective assistance of counsel on direct appeal, the circuit court properly denied him postconviction relief. *Hodges*, 234 Ill. 2d at 17. We therefore affirm the judgment of the circuit court of Cook County.

¶ 52    Affirmed.