2020 IL App (1st) 170650

FIFTH DIVISION
Opinion filed: July 10, 2020

No. 1-17-0650

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 03 CR 27277 |
| DONELL SIMMONS, | ) ) | Honorable Lawrence E. Flood, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE HOFFMAN delivered the judgment of the court, with opinion.
Justices Rochford and Delort concurred in the judgment and opinion.

**OPINION**

¶ 1     The defendant, Donell Simmons, appeals from an order of the circuit court of Cook County,

granting the State's motion to dismiss his postconviction petition pursuant to the Post-Conviction

Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)) at the second stage of proceedings. On

appeal, the defendant argues that he made a substantial showing that he is actually innocent of the

crimes for which he was convicted, his trial counsel was ineffective for failing to investigate and

present an eyewitness, and his appellate counsel was ineffective for failing to argue that the circuit court erred in denying his motion to suppress. For the following reasons, we reverse and remand for a third-stage evidentiary hearing on the defendant's claim that his trial counsel was ineffective for failing to investigate and present an eyewitness.

¶ 2 The defendant was charged, along with codefendants Labar "Bro-Man" Spann, Martise "Shorty" Nunnery, and Marcus "Black" Ware (also known as John Coleman) with, *inter alia*, multiple counts of first degree murder and aggravated battery with a firearm. The charges against the defendant stemmed from the June 4, 2003, shooting that resulted in the death of Randy "Kato" Rangel Jr. and the injury of Harrison Hall. Following a severed bench trial on June 2, 2008, the defendant was convicted of first degree murder and aggravated battery with a firearm and sentenced to consecutive terms of 47 years' imprisonment for the murder and 6 years' imprisonment for the aggravated battery.

¶ 3 The following facts relevant to the disposition of this appeal were derived from the record.

¶ 4 Prior to his trial, the defendant filed a motion to quash his arrest and suppress evidence, alleging that police did not have probable cause to arrest him without a warrant. At the hearing, the defendant presented the testimony of Detective Keith Allen. According to Detective Allen, on November 22, 2003, he went to 4223 West Wilcox Street with 10 members of a gang tactical team. The officers went to the building because they had an investigative alert stating that the defendant was suspected of killing Rangel. Detective Allen was positioned at the rear entrance to the building, and after other officers entered, they opened the rear door for him. Inside, he saw the defendant in handcuffs. Detective Allen acknowledged that he did not have a search or arrest warrant for the defendant.

¶ 5    The State presented Sergeant Charles Daly, who testified that, at the time, he was a detective assigned to investigate the June 4, 2003, shooting. As part of his investigation, Sergeant Daly learned that an individual named "Rio" wore a body wire to record conversations with Nunnery. Sergeant Daly stated that Rio was "fighting a federal drug case and decided to cooperate with investigative officers from organized crime." Sergeant Daly reviewed a transcript of the recorded conversation between Rio and Nunnery, testifying that the two largely used slang terms and expressions. According to Sergeant Daly, he subsequently spoke to Rio, who told him that it was his belief that the conversation referred to Nunnery's involvement in Rangel's shooting. Rio also told him that he believed that Nunnery was telling him that "Squeaky" shot Rangel and that "Bro-Man" was also involved.

¶ 6    On November 13, 2003, Sergeant Daly met with Spann following his arrest on unrelated charges. According to Sergeant Daly, Spann told him the following: he was with the defendant and Nunnery on the day of the shooting; Nunnery received a phone call and they drove to Sacramento Boulevard and Roosevelt Road, where Nunnery handed the defendant a .45-caliber handgun; the defendant exited the vehicle, and shortly thereafter, he heard gunshots and left the area; he subsequently spoke with the defendant, who told him that he killed Rangel. Spann also told Sergeant Daly that Squeaky was the defendant's nickname.

¶ 7    Nunnery was arrested the following day and provided a videotaped statement. Sergeant Daly testified that he viewed the recording and he described the contents to the court. Nunnery stated that he received a phone call from Ware informing him that Rangel was at a barber shop near the intersection of Sacramento Boulevard and Roosevelt Road. He drove to that location with Spann and the defendant. He handed the defendant a handgun, who then exited the car and entered

the barber shop. A short time later, he heard gunshots. He subsequently spoke with the defendant, who told him that he shot and killed Rangel. The parties stipulated that Nunnery initially denied any involvement in the shooting.

¶ 8     Ware, who goes by the nickname "Black," was arrested on November 14, 2003, and gave a videotaped statement. Sergeant Daly testified as to the contents of that statement. Ware stated that Nunnery asked him to call if he saw Rangel at the barber shop on Sacramento Boulevard and Roosevelt Road. He believed that Nunnery intended to rob Rangel and that he would be paid $1500 for making the phone call. On June 4, 2003, he saw Rangel at the barber shop and called Nunnery. Subsequently, he learned from Nunnery that "they" had successfully killed Rangel.

¶ 9     Sergeant Daly also obtained information from Darren McCline, who was arrested and made a statement to Detective Patrick O'Donovan and an assistant state's attorney (ASA), which was reduced to writing on November 19, 2003. According to McCline's statement, the defendant told him that he had shot and killed Rangel and that he was enticed to do so by Nunnery and Spann.

¶ 10     Defense counsel argued that the State did not establish that it had probable cause to arrest the defendant because Rio's recorded conversation with Nunnery did not explicitly reference either a shooting or Rangel and the information linking the defendant to the shooting was unreliable as it all came from individuals who were under arrest. The circuit court denied the defendant's motion, finding "that there was more than sufficient, almost overwhelming probable cause as to each defendant *** to make their arrest and any evidence derived there from should not be suppressed."

¶ 11     At the defendant's severed bench trial, Hall testified that, on June 4, 2003, he was in a trailer on the corner of Sacramento Boulevard and Roosevelt Road where he worked as a barber.

He was cutting Rangel's hair when a man, whom he identified in court as the defendant, entered the trailer and fired several shots at Rangel. Hall was standing about two feet away from the defendant when he opened fire and could see his face under bright florescent lights. Hall ran past the defendant, exiting the trailer. He went to the hospital where he learned that he was shot in the foot.

¶ 12    Hall acknowledged that he initially told the police that he did not get a good look at the shooter's face. He testified that he lied about seeing the shooter because he did not want to be involved in the situation. On November 22, 2003, he was asked to view a lineup at the police station. After viewing the lineup, he identified the defendant as the shooter. On cross-examination, Hall testified that the police told him prior to viewing the lineup that the shooter might be in the lineup. Defense counsel then asked Hall if, when he was viewing the lineup, he "expected that maybe somebody in there was the person who shot in the trailer at you?" He responded, "Right."

¶ 13    Lavelle Green testified that, on the day in question, he was 15 years old and he and his friend, Maurice Williams, were sitting outside the barber shop trailer waiting to get a haircut when a man went into the trailer. He heard gunshots and ran. Green testified at trial that he could not identify the individual he saw enter the trailer that day. He acknowledged that, on November 22, 2003, he viewed a lineup and identified the defendant as the man he saw enter the trailer that day. He stated that he identified the defendant after the police told him to "pick the person who looked like [the shooter]." The State impeached Green with a written statement that he provided to the police. He acknowledged that he signed the statement, but he stated that he could not remember the particulars of the statement. He stated that he signed the statement so "they could let [him] go." In the written statement, Green identified the defendant as the shooter.

¶ 14    The parties also stipulated that, if called to testify, Chicago police sergeant Jose Lopez would state under oath that he was present when Green identified the defendant as the individual who shot Rangel.

¶ 15    Ware testified that his given name is John Coleman and that "Ware" is his "alias for the police." He acknowledged that he has prior convictions for unlawful use of a weapon, obstruction of justice, and traffic offenses. He testified that he was a named codefendant in this case and, pursuant to an agreement with the State, pled guilty to conspiracy to commit first degree murder in exchange for an agreed sentence of 12 years and the truth of his testimony at trial. He explained that, pursuant to the agreement, he must testify truthfully or else be charged with first degree murder and perjury. He stated that, as of the date of the trial, he was housed in the witness protection quarters of the county jail.

¶ 16    Ware testified that, in April 2003, Nunnery called and asked if he could call him if he saw Rangel. He believed that the plan was to kidnap Rangel, a high-ranking member of the Latin Kings, whom he had known for several years. Later in that month, he drove with Nunnery and the defendant looking for Rangel, but they were unsuccessful. A few days later, Nunnery told him that the plan was to kill, not kidnap, Rangel and that there was a "ransom" of $190,000 and 15 kilograms of cocaine. Nunnery offered to pay him $2000 in exchange for providing Rangel's location. On June 4, 2003, he called Nunnery and told him that Rangel was in Hall's barber shop on Sacramento Boulevard and Roosevelt Road. After the call, he waited in Douglas Park across the street from the trailer. Shortly thereafter, he heard gunshots coming from the trailer and could see people running out of the trailer, including the defendant. He saw the defendant run down

Sacramento Boulevard towards Roosevelt Road and then into an alley. Ware did not see anything in the defendant's hand.

¶ 17    On cross-examination, Ware testified that he gave a videotaped statement to the police after his arrest on November 14, 2003. He acknowledged that, in the statement, he said he did not know Nunnery intended to kill Rangel. He also acknowledged that his testimony included several details he did not provide to the police, such as looking for Rangel with Nunnery and the defendant, that Nunnery was going to receive $190,000 and 15 kilograms of cocaine for the murder, that he was at Douglas Park when Rangel was shot, and that he saw the defendant exit the trailer. Instead, he told the police and the ASA that he was a few blocks away when he heard the gunshots and that it was a few days later that he found out that "Squeaky" shot Rangel. He acknowledged that he did not provide these details until after he entered plea negotiations and the plea deal was finalized. On redirect-examination, Ware stated that he did not tell the police and ASA "everything" at the time of his arrest because he did not want to "involve" himself in the case.

¶ 18    Chicago police detective O'Donovan testified that he interviewed the defendant on November 22, 2003, following his arrest. He advised the defendant of his *Miranda* warnings and the defendant agreed to speak with him. During the course of the interview, the defendant admitted that he was the shooter and detailed how Nunnery and Spann approached him and promised him money to shoot Rangel. Detective O'Donovan testified that the defendant provided him with the following version of events. On the date of the shooting, Spann and Nunnery picked him up and told him that they knew Rangel's location. They drove by a carwash and observed Rangel's truck there. They stopped one block west of Sacramento Boulevard, and Spann handed him a firearm. The defendant walked into a trailer that was operating as a barber shop, saw Rangel in the barber's

chair, and fired at him before fleeing. The defendant told Detective O'Donovan that the motive for killing Rangel was retribution for stealing a significant quantity of drugs.

¶ 19    ASA Andreana Turano testified that, in the early morning hours of November 22, 2003, she spoke with the defendant in an interview room. After advising him of his *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), he agreed to have a conversation. He indicated that he had been treated fine and did not have any complaints. He agreed to make a handwritten statement, which was published at trial. According to the defendant's handwritten statement, he goes by the nickname "Squeaky." In May 2003, Spann, whom he knew as "Bro-Man," approached him about shooting someone and introduced him to Nunnery. He learned that the target was Rangel and that Spann would pay him $30,000 for killing him. At some point, he rode in a car with Ware, whom he knew as "Black," Spann, and another person he did not know, when Spann got a phone call from Nunnery. They drove to a location where Spann pointed out that the man shaking hands with Nunnery was Rangel, the intended target. On June 4, 2003, he got into a van with Spann and Nunnery and drove to a trailer that operated as barber shop. They parked about one block away, where Spann gave him a firearm. He exited the car, entered the trailer, and shot Rangel as he was getting his haircut. He then ran back to the van and gave the gun to Spann. The defendant stated that he was enticed into the shooting by Nunnery and Spann but was never paid the money he was promised.

¶ 20    The court found the defendant guilty of first degree murder. In announcing its verdict, the court stated that it believed Ware's testimony and that the defendant's confession was "convincing and compelling" and that his insistence that he was enticed by Nunnery and Spann "have a definite ring of truth going to the reliability and trustworthiness of [his] confession."

¶ 21    The court denied the defendant's motion for a new trial, stating that "I believe that the evidence in this case was overwhelming, not at all close and that any possible error in this bench trial would be harmless beyond a reasonable doubt ***."[1] Following a sentencing hearing, the court sentenced the defendant to consecutive terms of 47 years' imprisonment for first degree murder and 6 years' imprisonment for aggravated battery with a firearm.

¶ 22    On direct appeal, we affirmed the defendant's convictions and sentences over his contention that his jury waiver was invalid. *People v. Simmons*, No. 1-08-2532 (2010) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 23    On December 1, 2008, the defendant filed a petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2008)), arguing that the prosecution fabricated the indictment and that the homicide statute violated both the *ex post facto* doctrine and the single subject rule. On February 18, 2009, the circuit court dismissed the defendant's section 2-1401 petition, and the defendant filed an appeal (No. 1-09-0742). The defendant filed a motion to reconsider the circuit court's denial of his section 2-1401 petition, which the court denied, and the defendant appealed (No. 1-09-1652). We granted the defendant's motions to dismiss both appeals on December 14, 2009, and January 27, 2010, respectively.

¶ 24    On September 20, 2011, the defendant filed a combined *pro se* postconviction petition for relief under the Act and under section 2-1401 of the Code. In his petition, the defendant argued, *inter alia*, that his trial counsel was ineffective for failing to investigate and call Green's brother, Shardell Green, as a witness. According to the defendant, Shardell was a witness to the shooting,

---

[1] We could not find a copy of the defendant's motion for a new trial in the record nor did the parties cite to a copy in their briefs on appeal.

gave a statement to the police, and was willing to testify that someone other than the defendant committed the offense.

¶ 25     In support of his claim, the defendant attached two affidavits from Shardell to his postconviction petition. In the first affidavit, which was signed by Shardell and notarized on July 30, 2009, he averred that, in September 2007, a lawyer he identified as "Mr. Fulton" came to visit him in jail and asked if he witnessed the June 4, 2003, shooting. Shardell told him that, after hearing gunshots coming from inside the barber shop, he saw "a skinny medium complexion man about [5'9"] run out of the barber shop." Shardell stated that the man "was still shooting" when he exited the shop and then "ran toward Whipple." Shardell also stated that the picture Fulton showed him did not depict the shooter he saw running out of the barber shop. Shardell told Fulton he would be willing to testify, but Fulton did not contact him again. In the second affidavit, which is notarized but undated, Shardell averred that he witnessed the June 4, 2003, shooting and spoke with the police. He stated that he told the police the same thing that he told a lawyer named "Mike Fulton," which was that he saw a "skinny light-skinned man run out the [*sic*] barber shop shooting." The man he saw then "ran west down Roosevelt Rd." Shardell also averred that Fulton showed him photographs of the defendant and Nunnery and he told Fulton that neither of them were the shooter. He told Fulton that he was "willing to come to court" but was never contacted.

¶ 26     On December 23, 2011, the circuit court appointed postconviction counsel to represent the defendant. On August 16, 2015, appointed counsel filed a supplemental petition that included the above mentioned claims from the defendant's *pro se* petition and added two claims: that the defendant's appellate counsel was ineffective for failing to challenge the trial court's ruling on his motion to quash arrest and suppress evidence where the State failed to establish probable cause

because the officer who issued the investigative alert did not testify and that the defendant was actually innocent of the crimes for which he was convicted based on Shardell's affidavit. Regarding Shardell, the supplemental petition argued that he should have been known to trial counsel because his name is listed in police reports as a "potential eyewitness" to the shooting and he was interviewed by Nunnery's counsel.

¶ 27    Attached to the supplemental petition was a third affidavit from Shardell and a copy of the investigative alert. In Shardell's affidavit, which was signed and notarized on March 20, 2015, he stated that, on June 4, 2003, he was sitting on the steps of the barber shop with his brother Lavelle and Williams when a man ran past them into the barber shop. Shardell's description of the shooter and the ensuing events was the same as the previous two affidavits. He also averred that he saw a picture of the defendant and he was not the person he saw that day. Shardell also described meeting with Fulton "some time" before he pled guilty in a separate case in September 2007. Shardell stated that "[a]ny picture that Mr. Fulton showed me was not of the person I saw at the trailer that day." Shardell averred that no other lawyer or investigator ever interviewed him about the shooting.

¶ 28    The attached copy of the investigative alert stated that "[t]he above subject was identified as the person who shot the victim with a handgun thereby causing his death" and lists Detective William Ruck as the contact person.

¶ 29    On April 26, 2016, the State filed a motion to dismiss both the combined *pro se* postconviction petition and the supplemental petition, arguing that the defendant's section 2-1401 petition was untimely and that the defendant's appellate counsel was not ineffective because the evidence at the suppression hearing established that the officers had probable cause to arrest. The

State also argued that the defendant's actual innocence claim should be dismissed because Shardell's testimony was not of such a conclusive nature that it would probably change the result on retrial in light of the defendant's confession and Hall's eyewitness testimony. The State's motion does not appear to make any argument as to the defendant's claim that his trial counsel was ineffective for failing to investigate or present Shardell.

¶ 30 On July 21, 2016, the defendant filed a response to the State's motion to dismiss and a motion for leave to file a supplemental affidavit from Irineo Barbosa in support of his claim of actual innocence. In an attached affidavit, Barbosa averred that he was Spann's cellmate in December 2003. He stated that Spann told him, while "bragging" about past crimes, that someone named "the Post-man" shot Rangel and that Spann, the Post-man, and Spann's "girl's little brother" were the ones involved. According to Barbosa, Spann told Ware to say that Nunnery "set the whole thing up" and threatened Ware's mother. Barbosa subsequently met Nunnery and told him that he would be willing to sign an affidavit relating what Spann told him.

¶ 31 On February 21, 2017, the circuit court granted the State's motion to dismiss the defendant's combined *pro se* petition and supplemental petition. Regarding the defendant's section 2-1401 claims, the court found that the claims were untimely filed. As to the defendant's claim of actual innocence, the court found that Shardell's affidavit did not contain newly discovered evidence because he was listed on police reports as a potential eyewitness and, therefore, could have been discovered sooner with due diligence. Regarding Barbosa's affidavit, the court found that it was not of such a conclusive character that it would have changed the result because it consisted of inadmissible hearsay and did not identify the actual shooter or provide the defendant with an alibi. As to the defendant's claim of ineffective assistance of trial counsel for failing to

investigate and call Shardell, the court concluded that the defendant could not establish prejudice because Shardell "did not observe the shooting and therefore cannot exonerate [the defendant]" and his testimony was "vastly outweighed by the multiple occurrence witnesses at the scene and [the defendant's] own inculpatory statements." Lastly, the court found that the defendant's claim of ineffective appellate counsel was "meritless." This appeal followed.

¶ 32 On appeal, the defendant argues that the circuit court erred in granting the State's motion to dismiss his postconviction petition at the second stage of proceedings because his petition made a substantial showing that (1) he is actually innocent of the crimes for which he was convicted based on Barbosa's affidavit; (2) his trial counsel was ineffective for failing to investigate and present Shardell, an eyewitness to the shooting; and (3) his appellate counsel was ineffective for failing to argue that the State failed to establish that his arrest was supported by probable cause.

¶ 33 The Act provides a procedural mechanism through which a petitioner may assert a substantial denial of his constitutional rights in the proceedings that resulted in his conviction. 725 ILCS 5/122-1 *et seq.* (West 2012). At the first stage of a postconviction proceeding, the circuit court independently reviews the defendant's petition, taking the allegations as true, and determines if it is frivolous or patently without merit. *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). If the postconviction petition is not summarily dismissed, as here, it advances to the second stage, where the State may file a motion to dismiss the petition and the postconviction court must determine whether the petition and any accompanying documents make a substantial showing of a constitutional violation. *Id.* at 10-11, 11 n.3. At the second stage of proceedings, the postconviction court takes "all well-pleaded facts that are not positively rebutted by the trial record" as true. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). If the petition fails to make a substantial showing

of a constitutional violation, it is dismissed; if such a showing is made, the postconviction petition advances to the third stage where the court conducts an evidentiary hearing. 725 ILCS 5/122-2.1, 122-6 (West 2012). We review a dismissal of a petition at the second stage *de novo. People v. Whitfield*, 217 Ill. 2d 177, 182 (2005).

¶ 34    The defendant first contends that he made a substantial showing that he is actually innocent of the crimes for which he was convicted. The defendant's argument on appeal is based only on the evidence contained in Barbosa's affidavit and does not include any argument regarding Shardell's affidavit.

¶ 35    In order to succeed on a postconviction claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). New evidence means it was discovered after trial and could not have been discovered earlier through the exercise of due diligence. *People v. Burrows*, 172 Ill. 2d 169, 180 (1996). Material means the evidence is relevant and probative of the defendant's innocence. See *People v. Smith*, 177 Ill. 2d 53, 82-83 (1997) (plurality opinion). Noncumulative means the evidence adds to what the jury heard. *People v. Molstad*, 101 Ill. 2d 128, 135 (1984). And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. See *People v. Ortiz*, 235 Ill. 2d 319, 336-37 (2009). This standard "is extraordinarily difficult to meet." *People v. Coleman*, 2013 IL 113307, ¶ 94. The conclusiveness of the new evidence is the most important element. *People v. Sanders*, 2016 IL 118123, ¶ 47.

¶ 36    The defendant contends that the evidence contained in Barbosa's affidavit is newly discovered, noncumulative, material, and of such a conclusive character that it would probably

change the outcome at retrial. He also argues that the circuit court erred in finding that the affidavit contained inadmissible hearsay because hearsay is admissible at collateral proceedings, citing to *People v. Sanchez*, 115 Ill. 2d 238, 284-85 (1986), and *People v. Warren*, 2016 IL App (1st) 090884-C, ¶¶ 89-90. The State responds that Barbosa's affidavit would not change the outcome of a retrial because of the overwhelming evidence of the defendant's guilt, such as his written confession, Ware's testimony detailing the defendant's involvement, and Hall's eyewitness identification. We agree with the State.

¶ 37    We first address the State's contention that Barbosa's affidavit fails because it contains inadmissible hearsay. The supreme court recently adopted and amended Illinois Rule of Evidence 1101, which added "postconviction hearings" to a list of proceedings to which the rules of evidence—including the rules against hearsay—"do not apply." Ill. R. Evid. 1101(b)(3) (eff. Apr. 8, 2013). Because the rules of evidence do not apply to postconviction proceedings, we will consider the contents of Barbosa's affidavit even though it contains hearsay. See *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 119 (finding that the hearsay affidavits at issue in that case, indicating that a gang member had bragged to one of the affiants about shooting the victim, were admissible under Rule 1101(b)(3) and must be taken as true, at the second stage of postconviction proceedings).

¶ 38    Here, Barbosa's affidavit states that Spann told him, while "bragging" about his past crimes, that someone named "Post-Man" shot and killed Rangel. However, Barbosa's affidavit does not indicate that Spann's reference to Post-Man is a reference to someone other than the defendant. The defendant argues that the record indicates his nickname was Squeaky, not Post-Man. However, this argument supposes that an individual can have one, and only one, nickname.

"Evidence of actual innocence must support total vindication or exoneration, not merely present a reasonable doubt." *People v. Adams*, 2013 IL App (1st) 111081, ¶ 36. Simply put, this evidence does rise to that level.

¶ 39    Moreover, Barbosa's affidavit must be viewed in light of the overwhelming evidence of the defendant's guilt presented at trial. Most significantly, the State presented the defendant's signed statement in which he confessed to shooting Rangel at the behest of Nunnery and Spann. " 'A confession is the most powerful piece of evidence the State can offer, and its effect *** is incalculable.' " *People v. Miller*, 2013 IL App (1st) 110879, ¶ 82 (quoting *People v. Fillyaw*, 409 Ill. App. 3d 302, 316 (2011)). Furthermore, an eyewitness and a codefendant both implicated the defendant as the shooter. Hall, who testified that the perpetrator stood two feet away from him and was illuminated by bright florescent lights, identified the defendant. Similarly, Ware testified that he once drove with the defendant and Nunnery looking for Rangel. He also testified that, after informing Nunnery of Rangel's location, he stood in Douglas Park and watched the defendant flee from the trailer after hearing gunshots. Lastly, he testified that he subsequently spoke with the defendant, who admitted to him that he shot and killed Rangel. Given this evidence, we conclude that Barbosa's affidavit was not conclusive enough that it would probably lead to a different result. Accordingly, we find that the defendant failed to make a substantial showing of actual innocence.

¶ 40    The defendant next argues that he made a substantial showing that his trial counsel was ineffective for failing to investigate or present Shardell, an eyewitness to the shooting, who would testify that the man he saw shooting into the barber shop was not the defendant.

¶ 41    Ineffective assistance of counsel claims are considered under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "To prevail on a claim of ineffective assistance

[of counsel] under *Strickland*, a defendant must show both that counsel's performance 'fell below an objective standard of reasonableness' and that the deficient performance prejudiced the defense." *Hodges*, 234 Ill. 2d at 17 (quoting *Strickland*, 466 U.S. at 687-88). "If an ineffectiveness claim can be disposed of on the ground of insufficient prejudice, then that course should be taken, and the court does not need to consider the quality of the attorney's performance." *People v. Williams*, 2017 IL App (1st) 152021, ¶ 36.

¶ 42    It is well-established that the choice on what witnesses to call "is a matter of trial strategy, left to the discretion of counsel after consultation with the defendant." *People v. Peterson*, 2017 IL 120331, ¶ 80. However, trial counsel has a duty to conduct reasonable investigations into possible defenses. *People v. Domagala*, 2013 IL 113688, ¶ 38. The failure to interview known witnesses can indicate incompetence when their testimony could be exonerating. *People v. Steidl*, 177 Ill. 2d 239, 256 (1997). " '[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.' " *People v. Guest*, 166 Ill. 2d 381, 400 (1995) (quoting *Strickland*, 466 U.S. at 691); accord *People v. Pecoraro*, 175 Ill. 2d 294, 324 (1997).

¶ 43    We conclude that the defendant has made a substantial showing that his trial counsel was deficient for failing to contact Shardell as a potential exculpatory witness, meeting the first prong of the *Strickland* test. Shardell stated in his affidavit that he was present outside the barber shop on June 4, 2003, and that the person he saw fleeing the barber shop while shooting was not the defendant. He averred that he told this information to the police and to Mr. Fulton, who the defendant alleges was Nunnery's counsel. Shardell also stated that he would have testified at the defendant's trial but was never contacted by counsel. According to the record, police reports listed

Shardell as a potential eyewitness. We can find no strategic reason to explain why counsel may have decided not to interview Shardell. Taking the facts presented in the affidavits as true, as we must at this stage (*Pendleton*, 223 Ill. 2d at 473), the defendant met his burden of making a substantial showing that his trial counsel was deficient.

¶ 44    To determine, under the second prong of the *Strickland* test, whether trial counsel's failure to investigate prejudiced the defendant, we must look at the evidence presented at his trial. "Prejudice is demonstrated if there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different." *People v. Makiel*, 358 Ill. App. 3d 102, 105-06 (2005). "Whether the failure to investigate constitutes ineffective assistance of counsel is determined by the value of the evidence not presented at trial and the closeness of the evidence that was presented at trial." *People v. Harmon*, 2013 IL App (2d) 120439, ¶ 26.

¶ 45    Here, the State presented the following evidence of the defendant's guilt at trial: the defendant's handwritten confession, Hall's identification of the defendant as the man who shot him and Rangel, and Ware's testimony regarding the defendant's involvement in the plot to kill Rangel. The defendant contends that, given the weaknesses in the State's evidence, Shardell's testimony would have increased his chances of acquittal. Specifically, the defendant argues that his confession occurred after 10 hours in custody and multiple interrogations, Hall's identification is not credible given that he initially told police that he did not see the shooter's face, and Ware's testimony "was doubtful considering his status as a co-defendant testifying under a plea agreement." The State responds that the defendant failed to make a substantial showing of prejudice because the evidence of his guilt was overwhelming. We agree with the defendant.

¶ 46    Shardell's testimony that he was present at the barber shop and saw someone other than the defendant firing a weapon would have significantly bolstered defense counsel's argument that the State could not prove the defendant guilty beyond a reasonable doubt. Moreover, Shardell's testimony regarding the direction the shooter fled after the shooting would have contradicted Ware's testimony, possibly giving the trier of fact another reason to question his credibility. See *People v. Rodriguez*, 227 Ill. App. 3d 397, 405 (1991) ("[T]he testimony of an accomplice is to be viewed with suspicion."). In reaching this decision, we acknowledge that the State did present considerable evidence indicating the defendant's guilt. However, prejudice "may be found even when the chance that minimally competent counsel would have won an acquittal is 'significantly less than 50 percent,' as long as a verdict of not guilty would be reasonable." *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008) (quoting *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001)). Here, we conclude that, if Shardell had testified in a manner consistent with his affidavit, a verdict of not guilty would at least be reasonable. As such, we conclude that the defendant made a substantial showing that his trial counsel was ineffective for failing to investigate or present Shardell, and the circuit court should proceed to a third-stage evidentiary hearing on that claim.

¶ 47    The defendant's next contention on appeal is that he made a substantial showing that his appellate counsel was ineffective for failing to challenge the circuit court's ruling on his motion to quash arrest and suppress evidence where the probable cause to arrest was based on an investigative alert and the officer who issued that alert did not testify at the hearing. He also argues, in the alternative, that his appellate counsel was ineffective for failing to argue that his trial counsel was ineffective for failing to preserve the issue for appeal.

¶ 48    Claims of ineffective assistance of appellate counsel are judged against the same two-pronged *Strickland* standard. *People v. Lacy*, 407 Ill. App. 3d 442, 457 (2011) (citing *People v. Edwards*, 195 Ill. 2d 142, 163 (2001)). "[A] defendant must show both that counsel's performance 'fell below an objective standard of reasonableness' and that the deficient performance prejudiced the defense." *Hodges*, 234 Ill. 2d at 17 (quoting *Strickland*, 466 U.S. at 687-88). "Appellate counsel is not required to brief every conceivable issue on appeal, however, and it is not incompetence for counsel to refrain from raising issues that counsel believes are without merit." *Edwards*, 195 Ill. 2d at 163-64. Unless the underlying issue has merit, a defendant suffers no prejudice as the result of appellate counsel's failure to raise an issue on appeal. *Lacy*, 407 Ill. App. 3d at 457.

¶ 49    Here, the defendant argues that his appellate counsel was ineffective for failing to challenge the trial court's denial of his motion to quash arrest and suppress evidence. On a motion to quash arrest and suppress evidence, the defendant generally bears the burden of proof. *People v. Garcia*, 2017 IL App (1st) 142141, ¶ 28. However, "[a]n arrest without probable cause or a warrant based thereon violates" both the United States and Illinois constitutions. *People v. Lee*, 214 Ill. 2d 476, 484 (2005). Thus, "[o]nce the defendant submits evidence which shows that, at the time of the arrest, he was doing nothing unusual (*i.e.*, his conduct was not indicative of the commission of a crime) and he was arrested without a warrant, the defendant has made a *prima facie* case that the police lacked probable cause," and the burden then shifts to the State to show that the warrantless arrest was based on probable cause. *People v. Drake*, 288 Ill. App. 3d 963, 967 (1997). That said, the ultimate burden of proof remains with the defendant. *People v. Cregan*, 2014 IL 113600, ¶ 23.

¶ 50    In the instant case, the parties do not dispute that the defendant was not arrested pursuant to a warrant. Additionally, Detective Allen testified at the suppression hearing that the defendant

was already in handcuffs when he entered the residence and he did not see the defendant doing anything unusual or illegal at the time. Therefore, the State was required to demonstrate that the arrest was based on probable cause and, therefore, legally justified.

¶ 51    The defendant contends that the State failed to satisfy this burden because Detective Allen testified that he was arrested based solely on an investigative alert and the only other officer who testified, Sergeant Daly, offered no evidence that he was "connected" with the investigative alert. The defendant also notes that the investigative alert lists "Detective William Ruck" as the contact person. As a result, the defendant contends that we should not "presume" that Sergeant Daly "issued the directive to arrest."

¶ 52    The State responds by raising three arguments. First, the State argues that the defendant failed to preserve this claim for appellate review because it is "dissimilar" to the claim he raised in his supplemental postconviction petition. Second, it argues that the defendant's claim should be dismissed because his current claim is "substantively dissimilar to the argument raised by trial counsel at the pretrial hearing, which explains why the argument was not previously raised." The State goes on to contend that "[h]ad trial counsel specifically argued, for example, that the officer who issued the investigative alert lacked probable cause to do so, both parties would have had an opportunity to develop the record and the trial court would have had an opportunity to make a ruling based on that issue." Lastly, the State argues that it presented sufficient evidence to establish that officers had probable cause to arrest the defendant and any claim to the contrary on appeal would not have been meritorious.

¶ 53    To begin, we first address the State's contention that the defendant's argument on appeal is dissimilar to the argument raised in his supplemental postconviction petition. We find no merit

to the State's contentions. In his supplemental petition, the defendant argued that his appellate counsel was ineffective for failing to challenge the denial of his motion to quash arrest and suppress evidence because "the State failed to meet its burden of demonstrating that the arresting officers actually knew of sufficient facts or that the directive to arrest was actually made by an officer who knew sufficient facts." Noting that he was arrested pursuant to an investigative alert, the defendant argued that the record was silent as to who issued the alert and, given that Detective Ruck is listed as the contact person on the alert, "it should not be assumed" that it was Sergeant Daly, the officer who testified at the hearing. This is precisely the argument the defendant now raises on appeal, and we conclude, therefore, that he has not forfeited this argument.

¶ 54    We next address the State's contention that the defendant's claim of ineffective assistance of appellate counsel fails because the claim is "substantively dissimilar to the argument raised by trial counsel at the pretrial hearing, which explains why the argument was not previously raised." At the suppression hearing, the defendant's only arguments were that Rio's tape-recorded conversations did not explicitly reference either a shooting or Rangel and that the information implicating the defendant was unreliable because it came from individuals who were under arrest. We agree with the State that the defendant's argument at the suppression hearing was substantively dissimilar to the claim he now faults his appellate counsel for failing to raise. However, the defendant also argued in his supplemental postconviction petition that "[i]n the event this claim is viewed as inadequately preserved for review, trial counsel's ineffectiveness in failing to adequately preserve it could have been raised on appeal." Consequently, the State's argument does not have merit, and we must, therefore, determine whether a challenge to the trial court's denial of the

defendant's motion to quash arrest and suppress evidence on the grounds that the State failed to prove that the investigative alert was supported by probable cause would be meritorious.

¶ 55     An arrest secured without a warrant is valid only where it is supported by probable cause. *People v. Grant*, 2013 IL 112734, ¶ 11. Police have probable cause to arrest an individual when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the individual has committed a crime. *Id.* Whether probable cause exists depends on the totality of the circumstances at the time of the arrest. *Id.* An officer's factual knowledge, based on his or her police experience, is relevant to determining probable cause. *Id.* Whether probable cause exists is governed by commonsense considerations, and the calculation concerns the probability of criminal activity rather than proof beyond a reasonable doubt. *Id.*

¶ 56     Although an arrest may be based on information of which the arresting officer does not have personal knowledge, the State must show that the information the officer relied on was based on facts sufficient to show probable cause to support an arrest. *People v. Hyland*, 2012 IL App (1st) 110966 ¶ 22. An arresting officer may rely on information received in an official police communication, provided that the officer who issued the communication had probable cause to arrest. *People v. Lawson*, 298 Ill. App. 3d 997, 1001 (1998).

¶ 57     After reviewing the record, we conclude that the State presented sufficient evidence to establish that the police had probable cause to arrest the defendant for the shooting death of Rangel. At the hearing, Detective Allen testified that he arrested the defendant pursuant to an investigative alert stating that the defendant was suspected of shooting Rangel. Sergeant Daly, a former detective who was assigned to investigate the June 4, 2003, shooting, testified that his investigation produced the following information: Rio, a confidential informant, told him that a recorded

conversation with Nunnery indicated that the defendant shot and killed Rangel; Spann, who had admitted to being involved in the shooting, told him that the defendant subsequently confessed to him that he shot and killed Rangel; an individual named McCline provided a statement indicating that the defendant told him that he had shot and killed Rangel and that he was enticed to do so by Nunnery and Spann; and Nunnery recorded a confession implicating the defendant as the shooter. We agree with the trial court that this evidence "was more than sufficient" to establish that police had probable cause to arrest the defendant.

¶ 58    In urging reversal, the defendant relies primarily on *Hyland*, 2012 IL App (1st) 110966, to support his argument that his appellate counsel should have challenged the court's denial of his motion to quash arrest and suppress evidence on appeal. In *Hyland*, a defendant was approached by two officers based on an investigative alert stating that the defendant violated an order of protection. *Id.* ¶ 6. The officers took the defendant into custody and performed a custodial search that produced a weapon. *Id*. ¶ 3. He was arrested and charged with unlawful use of a weapon by a felon and unlawful possession of a firearm by a street gang member. *Id.* At the defendant's motion to suppress, the State presented only the testimony of the arresting officers, who stated that they approached the defendant based on the investigative alert but did not have personal knowledge of the facts underlying the issuance of the investigative alert. *Id*. ¶¶ 5-6. We reversed the trial court's denial of the defendant's motion to quash his arrest and suppress evidence, finding that the State "presented no evidence that the underlying facts of the investigative alert established probable cause to arrest defendant, either from the officer who issued the investigative alert or from the individual who obtained the protective order that defendant allegedly violated." *Id.* ¶ 25.

¶ 59 In relying on *Hyland*, the defendant acknowledges that his direct appeal was resolved on March 30, 2010, and that our opinion in *Hyland* case was issued on November 21, 2012, over two years later. See *People v. Simmons*, No. 1-08-2532 (2010) (unpublished summary order under Illinois Supreme Court Rule 23(c)). Appellate counsel's assessment of the merits of an issue depends on the state of the law at the time of the direct appeal. *People v. English*, 2013 IL 112890, ¶ 34 (citing *People v. Weninger*, 292 Ill. App. 3d 340, 345 (1997)). The defendant nevertheless insists that, although *Hyland* was not decided at the time his case was on appeal, his direct appellate counsel was "not required to be prescient in terms of knowing how [the appellate court] would eventually rule in *Hyland*" because the cases that formed the basis for *Hyland* were available, such as *People v. Lawson*, 298 Ill. App. 3d 997 (1998).

¶ 60 In *Lawson*, the circuit court granted a motion to quash arrest and suppress evidence filed by a defendant who was charged with, *inter alia*, armed robbery. The State appealed, and we affirmed, finding that the only witness for the State at the suppression hearing was the arresting officer, who testified that he arrested the defendant solely because he matched the description of a suspect in a radio bulletin. We stated that "when the State attempts to justify a warrantless arrest on the basis of a radio bulletin it must establish that *the officer who issued the bulletin* had probable cause to effect an arrest. (Emphasis in original.) *Lawson*, 298 Ill. App. 3d at 1001.

¶ 61 We find that the instant case is meaningfully distinguishable from both *Lawson* and *Hyland*. Here, unlike in *Lawson* and *Hyland*, the State presented Sergeant Daly, a former detective who was assigned to investigate the June 4, 2003, shooting, and who testified to the considerable information that his investigation into Rangel's death produced implicating the defendant as the shooter prior to his November 22, 2003, arrest. We acknowledge that Sergeant Daly did not

directly testify as to whether he issued the investigative alert; however, his testimony regarding what investigators knew prior to the issuance of the alert and the defendant's subsequent arrest is clearly an order of magnitude beyond what was presented to the court in *Lawson* and *Hyland*. Moreover, given the sheer amount of information uncovered by Sergeant Daly as part of his investigation, we believe that it was not unreasonable for the circuit court to infer that Sergeant Daly was responsible for the investigative alert. Accordingly, we conclude that the circuit court did not err when it denied the defendant's motion to quash his arrest and suppress evidence, and therefore, his appellate counsel was not ineffective for failing to challenge the ruling on appeal.

¶ 62     Lastly, we address the defendant's citation to *People v. Bass*, 2019 IL App (1st) 160640, *appeal allowed*, No. 125434 (Ill. Mar. 25, 2020). In *Bass*, a divided panel of this court concluded that an arrest is unconstitutional when it is based solely on an investigative alert, even where the investigative alert is supported by probable cause. *Id.* ¶ 43. In reaching that conclusion, the majority found that the Illinois Constitution required a warrant, based on probable cause, to issue before an arrest could be made and that an investigative alert, validating an arrest without the issuance of a warrant, violated the Illinois Constitution. *Id.* ¶ 62. The majority based its decision on the notion that the Chicago Police Department improperly utilized investigative alerts in an effort to circumvent the process of obtaining a warrant and arrest individuals without establishing probable cause to do so. *Id.*

¶ 63     The State argues that we should find that the defendant has forfeited any argument pursuant to *Bass* because he failed to raise such an argument in his supplemental postconviction petition. It also contends that, if we do address the issue, we should follow *People v. Braswell*, 2019 IL App (1st) 172810, which disagreed with the majority's decision in *Bass*. We agree with the State that

the defendant failed to raise an argument similar to *Bass* in his postconviction petition, and he cannot raise it for the first time on appeal. *People v. Jones*, 213 Ill. 2d 498, 505, (2004) (finding that the courts have "generally held that a claim not raised in a petition cannot be argued for the first time on appeal").

¶ 64    Forfeiture aside, we agree with *Braswell* and decline to follow *Bass*. As the *Braswell* court stated, the flaw in *Bass*'s reasoning is "that arrests must be based on probable cause, not warrants as the majority in *Bass* suggests." *Braswell*, 2019 IL App (1st) 172810, ¶ 39. This flawed reasoning in *Bass* "creates the somewhat paradoxical situation where police may arrest an individual without a warrant and without an investigative alert if they have probable cause to do so, but that same arrest becomes unconstitutional if police issue an investigative alert based on the same facts that gave rise to the probable cause." *Id.* Accordingly, we conclude, as did *Braswell*, that "the investigative alert must have a proper basis to show probable cause." See *id.* And, as we have already concluded, the State did present sufficient evidence in this case to establish that the police had probable cause to arrest the defendant based on an investigative alert.

¶ 65    In sum, we find that the defendant made a substantial showing that his trial counsel was constitutionally ineffective for failing to investigate and present Shardell as an exculpatory witness, and we remand to the circuit court for a third-stage evidentiary hearing on that issue. We affirm the circuit court in all other respects.

¶ 66    Affirmed in part, reversed in part, and remanded with directions.