2020 IL App (1st) 181636-U

THIRD DIVISION
September 30, 2020

No. 1-18-1636

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 99 CR 13459 |
| BERNARD PATTON, | ) ) | Honorable Domenica A. Stephenson, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices Ellis and Burke concurred in the judgment.

ORDER

¶ 1  *Held*:  The judgment of the circuit court of Cook County dismissing defendant's second stage postconviction petition is affirmed; defendant's postconviction petition alleging actual innocence was not of such a conclusive character that it would probably change the result on retrial.

¶ 2  Defendant was convicted of first degree murder for the death of Eric Harris and two counts of attempt first degree murder and two counts of aggravated discharge of a firearm for shooting at Willie Evans and Kevin Lawson.  Defendant filed a postconviction petition pursuant to section 5/122-1 of the Post-Conviction Hearing Act (725 ILCS 5/122-1 (West 2014)) alleging actual innocence based on newly discovered evidence including two affidavits in which the affiants stated an eyewitnesses who identified defendant as the shooter at trial effectively told

them his trial testimony identifying defendant as the shooter was untrue. The petition was advanced to second stage proceedings where the State filed a motion to dismiss the petition which was granted by the circuit court. Defendant timely appealed. For the reasons set forth below, we affirm the circuit court's judgment dismissing defendant's postconviction petition.

¶ 3                                      BACKGROUND

¶ 4      Defendant, Bernard Patton, appeals the circuit court's judgment dismissing his second-stage petition for postconviction relief.

¶ 5      After a bench trial, defendant was convicted of first degree murder for the death of Eric Harris and two counts of attempt first degree murder and two counts of aggregated discharge of a firearm for shooting at Willie Evans and Kevin Lawson. Defendant was sentenced to 30 years' imprisonment for the murder conviction and concurrent sentences of 10 years' imprisonment for the attempt murder of Evans, 10 years' imprisonment for the attempt murder of Lawson, and 10 years' imprisonment for each of the two aggravated discharge of a firearm convictions. Defendant's conviction and sentence were affirmed on direct appeal. (*People v. Patton*, No. 1-02-2554 (2004) (unpublished order under Illinois Supreme Court Rule 23)). Defendant's subsequent request for leave to appeal to the Illinois Supreme Court was denied. (*People v. Patton*, 209 Ill. 2d 595 (2004)).

¶ 6                                      Defendant's Trial

¶ 7      Willie Evans, Charles Robinson, Michael Johnson, and Detective John Fassl testified for the State. Catrese Simpson testified for the defense. The relevant evidence and details from defendant's trial are as follows.

¶ 8                                      Willie Evans' Trial Testimony

¶ 9    Willie Evans testified he was present when the shooting occurred and he identified defendant as the shooter. At the time of his testimony, Evans had been convicted of unlawful use of a weapon and was on probation for possession of cannabis. Evans testified that on January 27, 1999 at 9:30 p.m., he was standing on the corner of West 94th Street and South Laflin Street in Chicago with friends Harris and Lawson when Simpson, another friend from the neighborhood, approached and said that she had been raped by some men in a car. Evans then saw a bluish, purplish car drive past them three times at a speed of 10 to 15 miles per hour. There were three people in the car, one in the driver's seat, one in the front passenger seat, and one in the back seat behind the driver. The second time the car went past, Simpson identified it as the car driven by the men that had raped her and Evans was able to see defendant's face for 30 seconds to one minute. The third time the car drove past, defendant stuck his arm out of the open back window and shot at them more than six times. Harris was shot and killed, Evans and Lawson were not hit. Evans was able to see defendant's face in the back passenger seat of the car for one to two minutes at a distance of five feet away. The shooting was the first time Evans had ever seen defendant.

¶ 10    That night, Evans was questioned by police about the shooting. When asked to describe the people in the car, Evans responded they were black males with no further description. On February 10, 1999, Evans identified defendant as the shooter from a photo array and also identified a picture of the car involved in the shooting.

¶ 11                        Michael Johnson's Trial Testimony

¶ 12    Michael Johnson was driving his mother's car on the date of the shooting. He identified defendant to police as the shooter and gave a written statement identifying defendant as the shooter. Johnson later recanted his identification but, at trial, testified consistently with his

identification of defendant as the shooter. When Johnson testified at trial, he was in custody after being arrested 27 days earlier for failing to appear to testify in connection with this case.

¶ 13    At trial, Johnson testified his mother owned a purple Dodge Stratus in January 1999 which he was allowed to drive. On the evening of January 27, 1999, he drove his mother's vehicle to Phil Lewis' home where he saw defendant, who Johnson had known for several years from elementary school, as well as other males from the neighborhood. Defendant asked to use Johnson's mother's car which Johnson refused. Instead, Johnson agreed to give defendant a ride. Johnson, defendant, and two men Johnson did not know got into the car with defendant sitting in the back driver's side seat behind Johnson.

¶ 14    They first drove to West 92 Street and South Union Avenue to look for some girls defendant knew. When nobody was home, they left and Johnson drove them to 94th and Laflin. There, Johnson saw three males standing on the corner closest to the driver's side. Defendant fired three shots and said "I think I got one."

¶ 15    Johnson was arrested on February 8, 1999 after being implicated in the shooting. Johnson denied officers advised him of his rights but agreed he was told they were questioning him about Harris' murder. After initially denying he knew anything, Johnson gave a written statement identifying defendant as the shooter. Johnson claimed police forced him to give a statement implicating defendant by choking him and threatening to charge him with murder if he did not tell them what they wanted to hear. When asked at trial if Johnson told the police defendant was the shooter because defendant was the shooter or because of the officers' threats and actions, he responded "a little bit of both."

¶ 16    Before defendant's trial, on February 22, 2000, Johnson met with defendant's counsel and gave a signed statement stating he never saw defendant with a gun, he never saw defendant

shoot a gun, and he never drove any car from which shots were fired. Johnson testified at trial he gave this statement to defense counsel "so I could get this over with."

¶ 17                                  Charles Robinson's Trial Testimony

¶ 18    Charles Robinson corroborated Evans' testimony that Johnson and defendant were together on the day of the shooting. Robinson testified that on January 27, 1999, he was at his friend Lewis' house on West 96th Street and South Racine Avenue with several other guys including defendant, who Robinson had known since grammar school, and Johnson. At some point that evening, he saw defendant and Johnson leave Lewis' house together.

¶ 19    Following the shooting, Robinson was interrogated by police. When questioned by Detective John Fassl on February 9, 1999, Robinson told Fassl he went to Lewis' house sometime after 11:15 p.m. and Johnson arrived at about 1:45 a.m., stayed for 15 to 20 minutes then left. Robinson did not tell Fassl he saw defendant at Lewis' house.

¶ 20    On February 10, 1999, Robinson provided a written statement to the State's Attorney and testified before the grand jury that he saw defendant and Johnson leave Lewis' house together the night of the shooting. Robinson testified the statement to the State's Attorney and his grand jury testimony were true.

¶ 21    Robinson also acknowledged giving a signed statement to defense counsel on January 11, 2001. Robinson acknowledged the statement to defense counsel stated that he did not see defendant and Johnson leave Lewis' house together and that he saw Johnson leave 15 minutes before defendant. However, Robinson claimed he did not recall making those statements to defense counsel. Robinson testified the statement given to defense counsel was untrue.

¶ 22                                  Catrese Simpson's Trial Testimony

¶ 23    Simpson testified that on January 27, 1999, she saw Harris, a close friend of hers, standing on the corner of 94th and Laflin with two other people.  She told him she had just been attacked by two men at gun point.  Simpson had never seen the two men that had attacked her before but was able to get a good look at them.  Simpson had known defendant for years from the neighborhood and testified he was not one of the attackers.  Simpson denied telling police in January 1999 she had been attacked by three men rather than two but was impeached by the parties' stipulation to a detective's testimony.

¶ 24     While talking with Harris, Simpson saw a light blue Hyundai drive by twice.  The two men who had attacked her were inside the vehicle.  She identified the driver as the one who had the gun.  Simpson testified she did not see defendant in the vehicle.

¶ 25    Simpson was not present when the vehicle drove by the third time.  She was in her friend's garage nearby when she heard the gunshots.  Simpson subsequently learned Harris had been shot.

¶ 26                              Trial Court's Verdict and Direct Appeal

¶ 27    The trial court found defendant guilty of first degree murder of Harris, two counts of attempt first degree murder of Evans and Lawson, and two counts aggravated discharge of a firearm with respect to Evans and Lawson.

¶ 28    The trial court found Evans to be clear, compelling, credible, and not impeached in any material respect.  The court found that the other evidence corroborated Evans' testimony and established beyond a reasonable doubt defendant was the shooter.  The court also found Johnson and Robinson credible despite being impeached in certain respects but found Simpson not believable.  Defendant was subsequently sentenced.

¶ 29    Defendant appealed his conviction arguing the trial court erred in refusing to admit prior inconsistent statements from Johnson and Robinson as substantive evidence and that the evidence was insufficient to prove him guilty beyond a reasonable doubt. This court affirmed the trial court's judgment.

¶ 30                                    Postconviction Petition

¶ 31    On May 21, 2015, defendant filed his *pro se* postconviction petition (Petition) pursuant to section 5/122-1 of the Post-Conviction Hearing Act, 725 ILCS 5/122-1 (West 2014), alleging newly discovered evidence of actual innocence. Defendant attached to his Petition affidavits from Tyra McClure; Sterling Daniels; Curtis Dupart; Terrence Cox, defendant's mother, Beverly Patton; and his own affidavit.

¶ 32    In her affidavit McClure stated Johnson admitted he falsely identified defendant as the shooter. McClure stated she was at the store with Daniels in early 1999 when they saw Johnson who gave them a ride. Upon entering the car, McClure noticed an open bottle of liquor and that Johnson appeared "high on liquor." Johnson suddenly began crying. McClure assumed it was the alcohol. When asked if he was alright, "[Johnson] responded that he told the police that [defendant] had shot some people" and clarified "people" referred to "the guys on 94th and Laflin that got shot not long ago." Johnson further told McClure and Daniels "the night the guys got shot he left [defendant] outside [Lewis'] house and some friends and [Johnson] drove around partying." Johnson further stated "he was scared that the friends of the guy[s] that got shot would seek revenge on him because he involved himself into the case and made [Daniels] and [McClure] promise to keep what he said to [themselves]." Upon learning defendant was in prison for what Johnson had told her and Daniels about, she told defendant what Johnson had told them and defendant asked her to send him an affidavit.

¶ 33    In his affidavit, Daniels stated he was with McClure when Johnson admitted to falsely identifying defendant as the shooter.  Daniels' affidavit stated he was contacted by McClure to provide an affidavit concerning what he knew about defendant's case.  Daniels stated he was with McClure when they saw Johnson at a store on 95th and Laflin and he gave them a ride.  When they got into his car, Johnson stated "he was feeling bad because he lied at the grand jury telling the police that he witnessed [defendant] shoot two G.D.[S.] gang members on 94th and Laflin."  Johnson told McClure and Daniels "he knew nothing about the shooting and the man started crying scared because he thought that the G.D.[S.] street gang would seek revenge on him for saying he [was] involved with shooting their gang members."  Johnson also said "he needed to get out of town" and asked McClure and Daniels to promise never to repeat what he said "because it could get him killed."  They both agreed and Daniels never spoke about the conversation until McClure informed him about her conversation with defendant.

¶ 34    The affidavits of Dupart, Cox and Patton established the motive for Johnson to falsely identify defendant.

¶ 35    In his affidavit, Curtis Dupart stated that he was contacted by defendant and he told defendant about a conversation he had with Johnson in 2002.  According to Dupart, Johnson "bragged" about sending defendant to prison and stated he falsely identified defendant because defendant had "jumped" on him for selling crack cocaine to defendant's mother and had threatened to kill Johnson if he did it again.  Dupart stated that he had forgotten about the conversation and "only thought about it again after someone at a nightclub dedicated a song to defendant."

¶ 36    Torrence Cox stated he was in a car with defendant driving down Winston Avenue when they saw defendant selling crack to defendant's mother.  Defendant walked up to Johnson and

his mother and saw defendant punch Johnson in the face and they started fighting. Defendant got back into the car and told Cox he fought with Johnson because he was selling drugs to his mother.

¶ 37 Beverly Patton's affidavit stated defendant saw her buying drugs from Johnson. When defendant saw the transaction, he demanded that Johnson stop selling Beverly drugs. Defendant and Johnson argued and began fighting.

¶ 38 Defendant's affidavit stated he was not aware of the conversation between Johnson, Daniels, and McClure until McClure told him over the phone in February 2015 after defendant informed her why he was in prison. While he was aware of his fight with Johnson after catching Johnson selling drugs to his mother, defendant stated "[he] had no idea that Michael Johnson was holding a grudge *** [and] was caught totally off-guard by Curtis Dupart when [Dupart] told [defendant] of the statements [Johnson] made about [defendant] as well as about [Johnson's] feelings after [defendant] jumped [Johnson]."

¶ 39 The circuit court advanced defendant's Petition to second stage postconviction proceedings and appointed counsel to represent him. Defense counsel filed a Rule 651(c) certificate on August 24, 2016 with a notarized copy of the sworn statement defendant had attached to his petition. On July 12, 2017, the State filed a motion to dismiss defendant's Petition and on September 28, 2018, defendant filed his response to the motion. Argument on the State's motion was held on February 26, 2018 and, on June 20, 2018, the circuit court granted the State's motion and dismissed defendant's petition finding much of the evidence to be inadmissible hearsay and finding the evidence was not so conclusive that it would change the result on retrial. With respect to Cox, Dupart, and Beverly's affidavits, the trial court

additionally found the evidence was not newly discovered because defendant was directly involved in the altercation and, as such, the facts were known to him prior to trial.

¶ 40    Defendant timely appealed.  This appeal followed.

¶ 41                                    ANALYSIS

¶ 42    On appeal, defendant argues the circuit court erred in dismissing his postconviction petition because he made a substantial showing of actual innocence based on newly discovered evidence contained in affidavits that Michael Johnson, one of the two eyewitnesses to the shooting to testify at his trial, admitted to falsely identifying defendant as the shooter.

¶ 43    We review *de novo* a second stage dismissal of a postconviction petition.  *People v. Dupree*, 2018 IL 122307, ¶ 29.

¶ 44                          Post-Conviction Hearing Act

¶ 45    The Post-Conviction Hearing Act (Act), 725 ILCS 5/122-1 *et seq.* (West 2014), provides a mechanism for collateral attack of a conviction or sentence allowing for inquiry into constitutional claims relating thereto which were not, and could not be, adjudicated during the trial or determined on appeal.  *People v. House*, 2019 IL App (1st) 110580-B, ¶ 25.

> "In cases not involving the death penalty, the Act provides for postconviction proceedings that may consist of as many as three stages.  At the first stage, the *** petition *** may [be] summarily dismissed if the court finds it is frivolous and patently without merit."  *People v. Pendleton*, 223 Ill. 2d 458, 471-72 (2006).

¶ 46    If the petition is not dismissed it is docketed for further consideration in second stage proceedings.  *Id.*

> "At the second stage, counsel may be appointed to an indigent defendant and the State may file a motion to dismiss or an answer to the petition.  [Citation.]

> At this stage the circuit court must determine whether the petition and any accompanying documentation 'make a showing of a constitutional violation.' [Citation.]
>
> If the petitioner makes the requisite substantial showing *** he is entitled to a third stage evidentiary hearing. [Citation.]" *People v. Domagala*, 2013 IL 113688, ¶¶ 33-34.

¶ 47 Defendant's Petition was dismissed at second stage review. "[D]ismissal of a post-conviction petition is warranted only when the petition's allegations of fact—liberally construed in favor of the petitioner and in light of the original trial record—fail to make a substantial showing of imprisonment in violation of the state or federal constitution." *People v. Coleman*, 183 Ill. 2d 366, 382 (1998).

¶ 48 Making a substantial showing of a constitutional violation

> "does not mean, however, that evidentiary questions are to be resolved at this stage.
>
> * * * *
>
> The second stage of postconviction review tests the legal sufficiency of the petition. Unless the petitioner's allegations are affirmatively refuted by the record, they are taken as true, and the question is whether those allegations establish or 'show' a constitutional violation." *Id*. at ¶ 35.

¶ 49 Credibility is not an issue at the second stage of postconviction proceedings. *People v. Sanders*, 2016 IL 118123, ¶ 42. "At the second stage, the well-pleaded facts in the petition and accompanying affidavits, including any affidavits containing hearsay, which do not conflict with the record, are taken as true when determining whether a defendant has made a substantial

showing of his innocence so as to advance the petition to a third-stage evidentiary hearing[.]" *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 117. The substantial showing required to avoid dismissal at the second stage is greater than the standard that must be satisfied to obtain leave to file a successive petition. See *People v. Smith*, 2014 IL 115946, ¶ 29 (recognizing the three-stage process for postconviction proceedings should not be rendered superfluous); see also *People v. Morrow*, 2019 IL App (1st) 161208, ¶ 51; *People v. Lee*, 2016 IL App (1st) 152425, ¶ 47.

¶ 50                                 Actual Innocence

¶ 51    Defendant's Petition is based on a claim of actual innocence. Here, "[a] petitioner must make a substantial showing of actual innocence such that an evidentiary hearing is warranted." *Sanders*, 2016 IL 118123, ¶ 37.

> "In order to succeed on a postconviction claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. [Citation.] New evidence means it was discovered after trial and could not have been discovered earlier through the exercise of due diligence. [Citation.] Material means the evidence is relevant and probative of the defendant's innocence. [Citation.] Noncumulative means the evidence adds to what the jury heard. [Citation.] And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. [Citation.] This standard 'is extraordinarily difficult to meet.' [Citation.] The conclusiveness of the new evidence is the most important element. [Citation.]" *People v. Simmons*, 2020 IL App (1st) 170650, ¶ 35.

¶ 52     To be of such a conclusive character that it would probably change the result at trial, "[w]e must be able to find that petitioner's new evidence is so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *Sanders*, 2016 IL 118123, ¶ 47.

¶ 53     Defendant argues he made a substantial showing of actual innocence on appeal based only on the evidence contained in McClure's and Daniels' affidavits and does not include any argument regarding the remaining affidavits attached to his Petition. The State effectively concedes the affidavits of Daniels and McClure are newly discovered evidence, but argues the new evidence was cumulative and not conclusive. We need not address whether the evidence is new, material and not merely cumulative because we conclude that, even assuming these conditions have been satisfied, the evidence is not of such a conclusive character that it would probably change the result on retrial. See *id*.

¶ 54     We begin by acknowledging defendant's citation to Illinois Rule of Evidence 1101(b)(3), Ill. R. Evid. 110(b)(3) (eff. Sept. 17, 2019), and Illinois cases stating the rules of evidence do not apply to postconviction hearings. See *Velasco*, 2018 IL App (1st) 161683, ¶ 119 (holding hearsay affidavits admissible under Rule 1101(b)(3) and must be taken as true at second stage postconviction proceedings); see also *People v. Robinson*, 2020 IL 3273244, ¶ 78. In affirming the circuit court's ruling, we disregarded any arguments contrary to this Rule.

¶ 55     Nevertheless, here we conclude the affidavits of McClure and Daniels do not place the trial evidence in a different light and undermine the court's confidence in the judgment of guilt such that the fact finder would reach a different result after considering the prior evidence along with the new evidence. See *id*. at ¶ 48.

¶ 56    There were only two eyewitnesses to testify at trial that were present when the shooting occurred—Evans and Johnson.  At that time, both Evans and Johnson identified defendant as the shooter.

¶ 57    At trial, Evans positively identified defendant.  Though he had never seen defendant before the shooting, Evans' attention was directed at the vehicle and its occupants because his friend, Simpson, had identified the individuals in the car as the men who had assaulted her earlier that evening.  Evans had an unobstructed view of defendant's face on two of the three times the vehicle defendant was in drove by.  The first time he observed defendant's face it was for 30 seconds to one minute.  The second time, for one to two minutes from five feet away.  During his second viewing Evans testified he saw defendant stick his arm out of the open window and fire more than six times.  Evans identified defendant and the car in a photo array, and while his earlier description given to police of the vehicles' occupants being black males was extremely general, this description did not conflict with Evans' subsequent photo array and trial identification of defendant as the shooter.  Evans never wavered in his identification of defendant as the shooter.

¶ 58    Neither the affidavits submitted by defendant with his Petition nor the trial evidence undermined Evans' identification.  With respect to Robinson, he testified at trial he was not present when the shots were fired killing Harris.  Robinson's trial testimony corroborated Johnson's trial testimony in that it put defendant and Johnson together in Johnson's vehicle on the night of the incident.

¶ 59    Simpson's trial testimony also does not undermine Evans' eyewitness identification.  Simpson was not present on the third occasion the car drove by and when the shots were fired.  Moreover, as the State points out, Simpson's trial testimony only established that on the two

occasions she saw the vehicle drive by, she did not see defendant in the vehicle. This does not mean defendant was not in the vehicle on the two occasions she saw it drive by or on the third occasion the vehicle drove by and shots were fired at which time Simpson was not present.

¶ 60   As to Johnson, evidence was introduced at trial undermining his eyewitness identification of defendant as the shooter. Here we make no credibility judgment, only point out the trial court, in finding defendant guilty, heard statements contradicting Johnson's trial identification of defendant as the shooter.

¶ 61   When questioned by police, Johnson, at first denied knowing anything about the shooting. Johnson testified that before giving police his statement identifying defendant as the shooter, he was choked and threatened by them and this was part of the reason he identified defendant—the other part being that it was true. More significantly, in February 2000, Johnson gave a written statement to defense counsel stating he never saw defendant with a gun or shoot a gun and he never drove a car from which gun shots were fired. This statement directly contradicted Johnson's trial identification of defendant as the shooter. When asked about his pretrial contradictory statement during the trial, Johnson testified he lied to defense counsel in 2000 "so he could get this over with."

¶ 62   Here, McClure and Daniels' affidavits, which we presume to be true, offer nothing more than a secondhand account of Johnson making pretrial statements which contradict his subsequent trial testimony identifying defendant as the shooter. As defendant notes, the new evidence is just "***more*** evidence that Johnson was coerced into falsely stating that [defendant] was the shooter[.]"

¶ 63   We further note, Johnson's statements to McClure and Daniels, even if believed, do not exonerate defendant. Johnson's statements to McClure and Daniels establish that Johnson lied

about witnessing defendant shooting at the people on 94th and Laflin, that Johnson did not know anything about the shooting, and that he left defendant outside Lewis' house and was not with defendant at the time of the shooting. Because Johnson knew nothing about the shooting and was not present with defendant at the time of the shooting, his statements to McClure and Daniels offers neither an alibi for defendant nor do they implicate another individual for the shootings such that defendant could not have been responsible. While we recognize, defendant's new evidence need not be entirely dispositive or provide defendant total vindication, when considered along with the trial evidence, the new evidence does not undermine the court's confidence in the judgment of guilt. See *Robinson*, 2020 IL 123849, ¶¶ 48, 56 (stating "new evidence supporting an actual innocence claim need not be entirely dispositive" but requires "the petitioner present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt."). This is particularly true because the trial court, in finding defendant guilty, had the benefit of other similar statements made by Johnson which undermined his trial identification, but more importantly, given Evans' trial testimony identifying defendant as the shooter.

¶ 64    Given the aforementioned, we cannot say defendant's new evidence is enough to meet the very difficult standard of this most important element of our analysis. See *Simmons*, 2020 IL App (1st) 170650, ¶ 35. We do not believe there is a probability that the fact finder would reach a different result after considering the new evidence along with the trial evidence. See *Robinson*, 2020 IL 123849, ¶ 48.

¶ 65                              CONCLUSION

¶ 66    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 67    Affirmed.